**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>THE WORTH COLLECTION, LTD.,<br><br><br>Debtor. | Chapter 7<br><br><br>Case No. 20-10337 (BLS) |
| DOUGLAS T. TABACHNIK, in his capacity as the Chapter 7<br>Trustee of the bankruptcy estate of The Worth Collection, Ltd.,<br><br>Plaintiff,<br>v.<br><br>CATTERTON MANAGEMENT COMPANY, LLC; CATTERTON<br>MANAGING PARTNER V, LLC; THE WORTH COLLECTION<br>HOLDINGS, LLC; WORTH ACQUISITION, LLC; CAROLINE<br>DAVIS; JAY ROSENBERG; DAVID DEFEO; SETH GROSSMAN;<br>DIANA MANLEY; WENDY SELIG-PRIEB; COURTNEY DENBY;<br>ANDREA WEISS; LAMIRA FONDREN, JOHN DOES 1-10; DOE<br>CORPORATIONS 1-10; DOE LIMITED PARTNERSHIPS 1-10;<br>and DOE LIMITED LIABILITY COMPANIES 1-10,<br><br>Defendants. | Adv. Pro. No. 23-50315 (BLS)<br><br>**Re: Adv. D.I. 17, 30, 31, 32, 40, 41<br>47, 48** |
| DOUGLAS T. TABACHNIK, in his capacity as the Chapter 7<br>Trustee of the bankruptcy estate of The Worth Collection, Ltd.,<br><br>Plaintiff,<br>v.<br><br>CAROLINE DAVIS; JAY ROSENBERG; DAVID DEFEO; SANDRA<br>KIM-SUK; SETH GROSSMAN; COURTNEY DENBY; KELLY<br>COLLINS; MICHAEL J. FARELLO; J. MICHAEL CHU; SCOTT A.<br>DAHNKE; DIRK DONATH; JAMES HEXTER; JULIAN C. MACK;<br>ANDREW C. TAUB; NIKHIL THUKRAL; JOHN DOES 1-10; DOE<br>CORPORATIONS 1-10; DOE LIMITED PARTNERSHIPS  1-10; and<br>DOE LIMITED LIABILITY COMPANIES 1-10,<br><br>Defendants. | Adv. Pro. No. 23-50316 (BLS)<br><br>**Re: Adv. D.I.  11, 19, 20, 21, 38, 40,<br>46, 47** |

DOUGLAS T. TABACHNIK, in his capacity as the Chapter 7
Trustee of the bankruptcy estate of The Worth Collection, Ltd.,

               Plaintiff,

        v.

ROTHSCHILD & CO US INC; ROTHSCHILD INC.; JOHN
DOES 1-10; DOE CORPORATIONS 1-10; DOE LIMITED
PARTNERSHIPS 1-10; and DOE LIMITED LIABILITY
COMPANIES 1-10,

               Defendants.

Adv. Pro. No. 23-50318 (BLS)

**Re: Adv. D.I. 11, 18, 19, 29, 30**

---

DOUGLAS T. TABACHNIK, in his capacity as the Chapter 7
Trustee of the bankruptcy estate of The Worth Collection, Ltd.,

               Plaintiff,

        v.

CAROLINE DAVIS; JAY ROSENBERG; DAVID DEFEO; SANDRA
KIM-SUK; SETH GROSSMAN; COURTNEY DENBY; KELLY
COLLINS; MICHAEL J. FARELLO; J. MICHAEL CHU; SCOTT A.
DAHNKE; DIRK DONATH; JAMES HEXTER; JULIAN C. MACK;
ANDREW C. TAUB; NIKHIL THUKRAL; JOHN DOES 1-10; DOE
CORPORATIONS 1-10; DOE LIMITED PARTNERSHIPS 1-10; and
DOE LIMITED LIABILITY COMPANIES 1-10,

               Defendants.

Adv. Pro. No. 23-50319 (BLS)

**Re: Adv. D.I. 11, 19, 20, 21, 30, 31,
35**

---

DOUGLAS T. TABACHNIK, in his capacity as the Chapter 7 Trustee of
the bankruptcy estate of The Worth Collection, Ltd.,

               Plaintiff,

        v.

NEW WATER CAPITAL GP, LLC; NEW WATER CAPITAL, L.P.;
NEW WATER CAPITAL PARTNERS, L.P.; NWC WORTH
COLLECTION HOLDINGS, LLC; WORTH INVESTMENT
HOLDINGS, LLC; WORTH COLLECTION INTERMEDIATE
HOLDINGS, LLC; JOHN DOES 1-10; DOE CORPORATIONS 1-10;
DOE LIMITED PARTNERSHIPS 1-10; and DOE LIMITED
LIABILITY COMPANIES 1-10,

               Defendants.

Adv. Pro. No. 23-50320 (BLS)

**Re: Adv. D.I. 11, 15, 16, 24, 25**

# OPINION[1]

These adversary proceedings (the "Adversary Proceedings") were commenced by Douglas T. Tabachnik in his capacity as the Chapter 7 Trustee (the "Trustee") of The Worth Collection, Ltd. (the "Debtor") against various entities and nine individual defendants (collectively, the "Defendants"). The complaints in each Adversary Proceeding assert claims against specific Defendants arising out of a series of leveraged buy-out transactions undertaken by the Debtor in September 2016 (the "LBO Transaction"). The first three counts in every complaint assert the same claims: Count I – Substantive Consolidation; Count II – Declaratory Relief: Piercing the Corporate Veil; and Count III – Declaratory Relief: Collapsing of Transactions Associated with the LBO Transaction. The relief sought in Counts I – III is essential to the Trustee's ability to prevail against the Defendants on any of the remaining counts in his Complaints.

Before the Court are a number of Motions to Dismiss filed by Defendants for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Although the Motions to Dismiss contain arguments particular to the applicable complaint, each motion also seeks dismissal of Counts I, II and III.

For the reasons set forth below, the Court will grant the Motions to Dismiss with respect to Counts I, II and III.[2] The Court will also grant the Trustee leave to amend his Complaints.

# BACKGROUND

This Chapter 7 case was commenced by the filing of an involuntary petition on February 14, 2020, against the Worth Collection, Ltd. (the "Debtor"). The petitioning creditors were

---

[1] This Court has jurisdiction to decide the Motions pursuant to 28 U.S.C. § 157 and § 1334(b). These are core proceedings pursuant to 28 U.S.C. 157(b)(2)(F), (H) and (O). Venue is proper in this district under 28 U.S.C. § 1409(a).
[2] The Court does not reach today the arguments regarding dismissal of the other counts in the Complaints.

inventory suppliers or service providers to the Debtor's retail clothing sale business. On October 23, 2020, about eight months after the filing of the involuntary petition, the putative debtor filed an answer.[3] Another five months passed before the entry of an order for relief on March 24, 2021.[4] Three months later, on June 29, 2021, Douglas Tabachnik was elected by the creditors to serve as the Chapter 7 Trustee.[5]

### A.  The LBO Transaction

The claims in the Adversary Proceedings stem from the LBO Transaction that was consummated more than three years before the involuntary bankruptcy. The Complaint alleges that, prior to the LBO Transaction, all of the issued and outstanding stock of the Debtor was owned by The Worth Collection Holdings, LLC ("Holdings").[6] Holdings, in turn, was owned by Worth Acquisition, LLC ("Acquisition") and nine individuals (together with Worth Acquisition, the "Former Equity Holders").[7] The Complaint alleges that Catterton Managing Partner V, L.L.C. ("CMPV") held the equity of Acquisition and "was the seller representative of the Former Equity Holders selling their interests via the LBO Transaction."[8]

The Trustee's Complaint describes the significant events leading up to the LBO Transaction.  Early in 2016, the Former Equity Holders retained Rothschild & Co. ("Rothschild") to serve as a financial consultant and investment banker in connection with a sale

---

[3] Main Case D.I. 40. The docket indicates that there were no fewer than fifteen stipulations extending the time for the putative Debtor to answer or otherwise respond to the involuntary petition.

[4] Main Case D.I. 53.

[5] Main Case D.I. 87.

[6]  Compl. ¶53. Unless otherwise noted, all references in this Opinion to the adversary docket (Adv. D.I. __) or the Complaint refer to the docket entries in Adversary Proceeding No. 23-50315 (BLS) against Catterton Management Company, L.L.C. *et al.* and the Amended Complaint (Adv. D.I. 17) filed in that proceeding.

[7] Compl. ¶ 54. The Former Equity Holders, listed in descending order of volume of shares, are: Acquisition; Caroline Davis, Jay Rosenberg, David DeFeo, Seth Grossman, Diane Manley, Wendy Selig-Prieb, Courtney Denby, Andrea Weiss, and Lamira Fondren. *Id.*

[8] *Id.* ¶ 55. The Complaint further alleges that "CMPV and/or Catterton, either directly or indirectly, received over $31 million dollars in proceeds from Worth Acquisition in connection with the LBO Transaction." *Id.* ¶ 56.

of the Debtor or the Debtor's business.[9]  In June 2016, Rothschild prepared a "final bid summary" outlining two potential offers to purchase the Debtor, one from Hypatia Capital (the "Hypatia Offer") and another from New Water Capital Partners, L.P. (the "NWCP Offer").[10] The Former Equity Holders accepted the NWCP Offer.[11]

On September 29, 2016, the Debtor, Holdings, and the members of Holdings (as sellers), CMPV (as "seller representative"), and Worth Collection Intermediate Holdings, LLC ("Worth Intermediate")[12] (as the buyer) entered into a Stock Purchase Agreement (the "SPA").[13]  Under the SPA, Worth Intermediate acquired all of the issued and outstanding shares of capital stock of the Debtor (the "Stock Transfer") for a purchase price equal to $40 Million, plus cash on hand, subject to a working capital adjustment (the "Purchase Price").[14]  NWCP funded $20 million of the Purchase Price at the closing of the LBO Transaction.[15]

The remainder of the Purchase Price was financed from two sources, with the Debtor and Worth Intermediate as the borrowers. The first source was a term loan issued by Monroe Capital Management Advisors, LLC ("Monroe") in the amount of $22,379,000 (the "Monroe Loan").[16] The Monroe Loan was secured by a first-priority security interest in the Debtor's intellectual

---

[9] *Id.* ¶ 60-61.

[10] *Id.* ¶ 62. The key terms of the Hypatia and NWCP Offers are summarized in detail in the Trustee's Complaint. *See id.* ¶ 63. In short, the Hypatia Offer valued the Debtor at $30.81 Million, while the NWCP Offer valued the Debtor at $41 Million. *Id.* Defendants take the position that the final offers were remarkably similar, while the Trustee alleges that the two offers differed in several important respects.

[11] *Id.* ¶ 70.

[12] The Complaint alleges that Worth Intermediate "was a special purpose holding company established by NWCP to acquire all of the issued and outstanding shares of capital stock of the Debtor." Compl. ¶72.

[13] *Id.* ¶ 71.

[14] *Id.* ¶¶ 73-74.

[15] *Id.* ¶ 75.

[16] Compl. ¶¶ 79-80.  "At the closing of the LBO Transaction, the credit agreement with Monroe provided for one or more term loans which were to be partially amortized, with a substantial balloon payment to be due on September 29, 2021."  *Id.* ¶80. The Monroe Loan was subsequently amended four times between November 2017 and December 2018 to, among other things, waive numerous events of default.  *See id.* ¶¶ 92-94.

property assets, and a second-priority security interest in the Debtor's operating assets.[17]   The second source was a $10 million line of credit (the "Niagara Loan") with First Niagara Commercial Finance, Inc. ("First Niagara").[18]   The First Niagara Loan was secured by a first-priority lien on the Debtor's operating assets, and a second-priority security interest in the Debtor's intellectual property assets.[19]

The Trustee alleges that subsequent to the closing of the LBO Transaction, the Debtor failed to generate enough funds to service the LBO Obligations while also fulfilling the Debtor's other financial obligations.[20]   On June 25, 2019, the Debtor borrowed additional capital from MidCap Financial Trust (the "MidCap Loan") to, among other uses, pay off the Debtor's obligations to First Niagara.[21]   The Complaint asserts that MidCap was in the business of providing loans to borrowers who are greater credit risks and, therefore, the interest rates were higher than the First Niagara rates.[22]   The Debtor's obligations to MidCap were secured by a first-priority security interest in the Debtor's working capital assets and a second-priority security interest in the Debtor's intellectual property assets.[23]   Within six months of the MidCap Loan closing, the Trustee alleges that MCA Financial Group ("MCA") prepared a plan to winddown and liquidate the Debtor's business, and such plan was implemented beginning in December 2019.[24]

The Trustee seeks to avoid and recover as fraudulent transfers the payment of over $39.9 million to the Debtor's Former Equity Holders, as well as other fees and payments made as part

---

[17] Id. ¶ 82.
[18] Id. ¶ 77.
[19] Id. ¶ 78.
[20] Id. ¶ 97.
[21] Compl. ¶¶ 99-100.
[22] Id. ¶¶ 101-102.
[23] Id. ¶ 103.
[24] Id. ¶ 105.

of the LBO Transaction (the "Closing Distributions").[25] The Trustee's intentional fraud claims are comprised of two core allegations: (i) that "the Former Equity Holders knowingly authorized, approved, and directed the Debtor to enter into" the LBO Transaction, which the Trustee characterizes as "a transaction that was so 'one-sided' that fraudulent intent may be inferred;" and (ii) that the NWCP Offer involved a higher price tag, a higher valuation, and more borrowing than the Hypatia Offer, such that selecting the NWCP Offer over the Hypatia Offer was evidence of fraudulent intent.[26]

  The Chapter 7 Trustee also asserts claims for constructive fraud, arguing that the LBO Transaction, and the Monroe and Niagara Loans in particular, overly burdened the Debtor with debt that it was unable to service without the Debtor receiving anything close to reasonably equivalent value in return.[27] The Trustee alleges that NWCP and other Defendants caused the Debtor (and Worth Intermediate and related entity, Worth Investment Holdings, LLC ("WIH")) to enter into financing arrangements that required the Debtor to shoulder $25 million of loans secured by liens on the Debtor's assets.  In sum, the Trustee asserts that the "LBO Transaction amounted to a windfall payout to the Debtor's [Former Equity

---

[25] Compl. ¶¶ 83-84.  According to the Trustee, "of the $45,279,000 of Closing Distributions, over $39 million was transferred to the Former Equity Holders, as initial transferees, and some or all of the $31 million to Worth Acquisition was transferred upstream to the Subsequent Transferees." *See id.* ¶ 84. Each of the initial transferees and Subsequent Transferees received a portion of the proceeds from the LBO Transaction in the form of equity distributions. *Id.* ¶85. In addition, Former Equity Holders David DeFeo and Seth Grossman received transaction bonuses of $61,250 and $52,500, respectively, (*id.* ¶ 86), while NWCP received a payment in the amount of $400,000 (*id.* ¶ 88) and Rothschild received a fee in the amount of $1,019,947.79 (*id.* ¶ 89). Further, in conjunction with the LBO Transaction, Worth Intermediate and New Water Capital, L.P. ("NWC") entered into a consulting agreement (the "Consulting Agreement") that either remitted, or caused the Debtor to remit, hundreds of thousands of dollars to NWC and at least one preference payment in the amount of $40,099.03. *Id.* ¶¶ 113-118. The Debtor was left with $1,058,178.92 cash to sustain all of its operating expenses and massive debt service on a going-forward basis. Compl. ¶ 108.
[26] Compl. ¶110.
[27] "The staggering debt resulting from the LBO Transaction caused the Debtor's interest and financing related expenses to skyrocket to $1,760,000 in 2016 — an over five thousand percent (5,000%) increase from the prior year, despite the closing of the LBO Transaction occurring after approximately nine of the twelve months in that calendar year." *Id.* ¶ 124.

Holders], with the Debtor picking up the tab in the form of millions of dollars in debt and leaving the Debtor's creditors at risk, maintaining a bleak amount of operating cash in relation to its significant post-LBO Transaction debt obligations, and pledging all of its assets as security for the newly-incurred debt."[28]  The Trustee further alleges the Debtor had to borrow additional capital in June 2019 to help cover its financial obligations.[29]

Before the Court are the Defendants' motions to dismiss the Trustee's claims in the various adversary proceedings.  While the claims in each adversary complaint differ, all of the Trustee's complaints contain the same Counts I, II, and III.  Those are:

| Count I | Substantive Consolidation of the Debtor with NWCWCH,[30] WIH, and Worth Intermediate. |
| Count II | Declaratory Relief: Piercing the Corporate Veil – seeking a declaration that the Debtor Affiliates are mere instrumentalities, agents, and/or alter egos of the Debtor, and that the Worth Entities are a single legal entity. |
| Count III | Declaratory Relief:  Collapsing of Transactions associated with the LBO Transaction – seeking a declaration that collapses the Monroe Loan with the LBO Transaction, the Stock Transfer, the Rothschild Distribution, the Equity Distributions, and the Closing Distributions so that they are viewed as one single integrated transaction. |

The Defendants argue that Counts I - III are not based on well-pled factual allegations, but on broad, general, conclusory statements and, therefore, should be dismissed. To succeed on the fraudulent transfer claims, the Trustee must prove that the transfers at issue were made by the Debtor.  The Complaint alleges that the Closing Distributions were made by a non-debtor (Worth Intermediate), but the Trustee contends that the Debtor was the only operating entity and the

---

[28] *Id.* ¶ 133.
[29] *Id.* ¶¶ 97-105.
[30] NWC Worth Collection Holdings, LLC ("NWCWCH").  The Complaint defines "Debtor Affiliates" as NWCWCH, WIH, and Intermediate.  The Complaint also defines "Worth Entities" as the Debtor and the Debtor Affiliates.  Compl. ¶ 111.

non-debtor Worth Entities were formed solely to consummate the LBO Transaction and to shield the other parties from liability for depleting all value from the Debtor. The Trustee argues that the relief requested in Counts I – III (substantive consolidation, piercing the corporate veil or collapsing transactions) is necessary and appropriate to prevent severe prejudice to the Debtor's creditors.

The first three Counts are threshold issues:  all remaining counts are dependent upon the Trustee prevailing on at least one of the first three counts. The parties have fully briefed the Motions to Dismiss and have not requested oral argument. The Motions to Dismiss are ripe for disposition.

<u>**STANDARD**</u>

Defendants move to dismiss the Complaint pursuant to Rules 8(a) and 12(b)(6) of the Federal Rules of Civil Procedure, made applicable to these Adversary Proceedings by Rules 7008 and 7012 of the Federal Rules of Bankruptcy Procedure. Rule 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."[31] To satisfy that rule, the complaint must give the defendant "fair notice of what the [plaintiff's] claim is and the grounds upon which it rests."[32] "[W]ithout some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only 'fair notice,' but also the 'grounds' on which the claim rests."[33]  Rule 8(a)(2) requires "some showing sufficient to justify moving the case beyond the pleadings to the next stage of the litigation."[34]

---

[31] Fed. R. Civ. P. 8(a)(2).
[32] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted).
[33] *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 555, n.3).
[34] *Id.* at 234-35.

The required "showing" under Rule 8(a) is therefore informed by the "plausibility" standard enunciated in *Twombly*.[35]

When reviewing a motion to dismiss under Rule 12(b)(6), the court will "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."[36] In *Twombly*, the Supreme Court instructed that a pleading must nudge claims "across the line from conceivable to plausible."[37] "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[38] However, the Court need not and should not accept legal conclusions proffered as factual allegations.[39]

It is insufficient to provide "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements."[40] A complaint should be dismissed where its factual content does not allow a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged."[41] To determine whether a claim meets the *Twombly/Iqbal* standard of pleading, a Court must draw on its judicial experience and common sense.[42] The Third Circuit follows a three-step process to determine the sufficiency of a complaint:

---

[35] *See id.* at 234 ("'Plausibility' is related to the requirement of a Rule 8 'showing.'").

[36] *Crystallex Int'l Corp. v. Petróleos De Venezuela, S.A.*, 879 F.3d 79, 83 n.6 (3d Cir. 2018).

[37] *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009) (citing *Twombly*, 550 U.S. 544, 570).

[38] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

[39] *See Twombly*, 550 U.S. at 555; *Santiago v. Warminster Twp.*, 629 F.3d 121, 128 (3d Cir. 2010) ("[W]e disregard legal conclusions and 'recitals of the elements of a cause of action, supported by mere conclusory statements.'").

[40] *Giuliano v. Haskett (In re MCG Ltd. P'ship)*, 545 B.R. 74, 82 (Bankr. D. Del 2016). "[A] court need not credit either 'bald assertions' or 'legal conclusions' in a complaint when deciding a motion to dismiss." *Kanter v. Barella*, 489 F.3d 170, 177 (3d Cir. 2007) *overruled in part by In re Cognizant Tech. Sol. Corp. Derivative Litig.*, 101 F.4th 250 (3d Cir. 2024).

[41] *Iqbal*, 556 U.S. at 678.

[42] *Id.* 556 U.S. at 663-64. "[A] court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice." *Tilton v. MBIA Inc. (In re Zohar III, Corp.)*, 639 B.R. 73, 90 (Bankr. D. Del. 2022), *aff'd*,

First, the court must "take note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."[43]

The movant bears the burden of showing that the dismissal is appropriate under Rule 12(b)(6).[44]

## ANALYSIS

### A. Count I: Substantive Consolidation

Count I seeks to consolidate the Debtor with three non-debtor entities that were formed by New Water Capital Partners, L.P. ("NWCP") to effectuate the LBO Transaction—NWCWCH, WIH, and Worth Intermediate.[45]  Substantive consolidation is an equitable remedy that "treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities . . . [such] that claims of creditors against separate debtors morph to claim against the consolidated survivor."[46]

In *Owens Corning*, the Third Circuit ruled that proponents of substantive consolidation must prove either that: (i) prepetition, the entities disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity; or (ii)

---

620 F.Supp.3d 147 (D. Del. 2022), *appeal dismissed sub nom. In re Livent, Inc.* (3d Cir. Nov. 10, 2022) (quoting *In re Livent, Inc. Noteholders Sec. Litig.,* 151 F. Supp. 2d 371, 405–06 (S.D.N.Y. 2001)).

[43] *Burtch v. Milberg Factors, Inc*., 662 F.3d 212, 221 (3d Cir. 2011) (quoting *Santiago*, 629 F.3d at 121, 130).

[44] *Paul v. Intel Corp. (In re Intel Corp. Microprocessor Antitrust Litig.)*, 496 F. Supp. 2d 404, 408 (D. Del. 2007).

[45] As previously described, these three non-debtor entities are defined as the Debtor Affiliates, and together with the Debtor, the Worth Entities. As an initial matter, the Third Circuit has left open the possibility of allowing bankruptcy courts to consolidate non-debtors with debtors, while other courts have granted substantive consolidation of debtors and non-debtors. *Knight v. Caribbean Auto Mart of St. Croix, Inc*. (*In re Caribbean Auto Mart of St. Croix, Inc.*)*, Case No. 13-10003 (MFW), Adv. No. 18-01001 (MFW), 2021 WL 2419986, at *3 (Bankr. D.V.I. June 11, 2021); *Off. Comm. of Unsecured Creditors v. Comvest Grp. Holdings (In re HH Liquidation, LLC)*, Adv. No. 16-51204 (KG), 2017 WL 4457404, at *3 (Bankr. D. Del. Oct. 4, 2017).

[46] *In re Owens Corning*, 419 F. 3d 195, 205 (3d Cir. 2005) (quoting *Genesis Health Ventures, Inc. v. Stapleton (In re Genesis Health Ventures, Inc*.), 402 F.3d 416, 423 (3d Cir. 2005)).

postpetition, their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors.[47]

The Defendants also argue for dismissal of Count I because the Complaints lack specific factual allegations to support the substantive consolidation claim and merely recites the elements needed to prove such as claim.  The Trustee disagrees and asserts that the following allegations provide a sufficient factual basis to support the claim:

(i)    The Debtor Affiliates exercised complete control and domination over the Debtor such that they have no legal existence separate and distinct from the Debtor. (Compl. ¶ 135).

(ii)    The Debtor and one or more of the Debtor Affiliates are parties to the Monroe Credit Agreement, to which each are obligated to make repayments to Monroe. (Compl. ¶136).[48]

(iii)    In an attempt to hide assets from creditors, the Debtor Affiliates, under the direction of NWC, caused multiple intercorporate transfers to occur between the Worth Entities so as to shield liability from transfers that are otherwise avoidable. (Compl. ¶ 137).[49]

(iv)    Subsequent to the LBO Transaction, a number of individuals served as a director, officer, and/or manager of one of the Worth Entities concurrently while serving the same role with another one of the Worth Entities. (Compl. ¶ 138).[50]

(v)    The Worth Entities are inextricably intertwined both operationally and financially. (Compl. ¶ 142).

[47] *Id.* at 211.  The *Owens Corning* Court further directed that assessing whether to substantively consolidate entities requires an open-ended, equitable inquiry that considers policies such as (i) recognizing that state law creates the expectation that entity separateness will be respected absent compelling circumstances requiring the equitable remedy of substantive consolidation; (ii) substantive consolidation is mostly used to address harms cause by the debtors and the entities they control, since creditor harms may be remedied by Bankruptcy Code provisions such as equitable subordination, (iii) mere benefit to administration of the estate is not enough of a harm to require substantive consolidation; (iv) because substantive consolidation is an extreme remedy affecting creditors' rights and recoveries, it should be rarely used, only after considering and rejecting other more precise remedies; and (v) while substantive consolidation may be used defensively to remedy identifiable harms cause by entangled affairs, it may not be used offensively (for example, for the primary purpose to disadvantage tactically a group of creditors in the plan process).  *Id.*

[48] *See also* Compl. ¶ 79 ("On or around September 29, 2016, the Debtor and Worth Intermediate entered into that certain Term Loan Credit and Security Agreement (the "Monroe Credit Agreement") administered by Monroe Capital Management Advisors, LLC ("Monroe").

[49] *See also* Compl. ¶ 143 ("The Worth Entities shuffled assets between each other with the goal of shielding assets from creditors and insulating liability.").

[50] *See also* Compl. ¶ 145 ("The separateness of the Worth Entities was disregarded so significantly such that more than one of the Worth Entities were named as parties to the SPA and the Worth Entities had overlapping directors and officers.").

(vi)    At its core, the Worth Entities constitute a single unified entity. (Compl. ¶ 144).

The Trustee argues that substantive consolidation is necessary to distribute assets to creditors fairly and efficiently. The Trustee claims that "[t]he time and expense necessary to attempt to unscramble the entanglement of the Debtor's affairs with that of the other Worth Entities is so substantial that no accurate identification and allocation of assets is possible in the absence of substantive consolidation."[51] The Trustee also contends that "treating the Worth Entities as separate will severely prejudice the Debtor's creditors, as it would shield certain of the Worth Entities from liability on certain causes of action, including, without limitation, transfers that would otherwise be avoidable if the Worth Entities were consolidated."[52]

The Complaint contains many broad and general statements about the Worth Entities, but the Trustee's allegations fail to include any specific facts to support the substantive consolidation claim.  The allegations in Paragraphs 142 through 148 and 150 in Count I of the Complaint merely restate the factors courts may consider in evaluating substantive consolidation.  There are no underlying facts alleged concerning (for example) the Worth Entities' operations, management, accounting methods - or lack of accounting methods - regarding intercompany payments or transfers of assets to support the general allegations of intertwined operations and finances.

The allegations do not demonstrate that, post-petition, the Worth Entities' affairs were so entangled, and "the cost of untangling them is so high relative to their assets," that all creditors will benefit from consolidation.[53] Rather, the allegations that the Worth Entities ceased operations and were wound-down pre-petition, contradicts any inference that the Debtor's

---

[51] Compl. ¶ 147.
[52] Compl. ¶146.
[53] *Owens Corning*, 419 F.3d at 215.

assets and liabilities were "so scrambled" *post-petition* that separating them would be prohibitive.[54]

Likewise, the allegations do not include specific facts describing how, prepetition, the Worth Entities disregarded corporate separateness so significantly that their creditors relied on the breakdown of entity borders and treated them as one legal entity.  The Complaint contains only broad, general allegations about dominion and control over the Debtor,[55] or making intercompany transfers to hide assets,[56] but no examples of such actions. The Complaint alleges that the Worth Entities had overlapping directors and officers without naming anyone.[57]  Further, and importantly, there are no allegations describing creditors' interactions with the Worth Entities to show that creditors had relied on treating them as a single unit.[58]

The only specific fact pled by the Trustee about the Worth Entities relevant to consolidation is that the Debtor and Worth Intermediate shared liabilities arising from the SPA, the Niagara Loan, and the Monroe Loan.[59]  The Defendants argue that this fact alone is insufficient to support a substantive consolidation claim because parties structuring lending transactions often rely on corporate separateness of related entities for credit enhancements,

---

[54] *See, e.g.,* Compl. ¶¶ 105, 149.
[55] *Id.* ¶ 135.
[56] *Id.* ¶ 137.
[57] *Id.* ¶¶ 138, 145.  Paragraph 87 alleges that certain individuals remained as officers of the Debtor following the LBO, but there are no specific allegations that the Worth Entities had overlapping officers and directors. Regardless, an allegation of shared officers and directors has been held insufficient on its own to support a disregard of separate corporation existence.  *See U.S. v. Bestfoods*, 524 U.S. 51, 69 (1998) ("[I]t is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts" and recognizing the "well established principle [of corporate law] that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership.") (citations omitted).
[58] "Proponents [of substantive consolidation] who are creditors must also show that, in their prepetition course of dealing, they actually and reasonably relied on the debtor's supposed unity." *Owens Corning*, 419 F.3d at 212.  The Defendants argue that it would be unreasonable for the Court to infer that the LBO Transaction resulted in a drastic recalibration of creditor expectations after 25 years of continuous operation by the Debtor such that creditors suddenly began to rely on the Debtor's corporate parents, instead of just the Debtor, as their counterparty.  (Adv. No. 23-50230, D.I. 25 [Defendants' Reply Memo.] ¶ 6).
[59] Compl. ¶¶ 71, 77, and 79.

rather than viewing them as one indistinguishable entity.[60]   The Court agrees that the shared liabilities, standing on their own, will not provide a sufficient factual predicate for a substantive consolidation claim.

In *Owens Corning*, the Third Circuit noted that "substantive consolidation may be used defensively to remedy the identifiable harms caused by entangled affairs, [but] it may not used offensively"[61]   In particular, the *Owens Corning* court found that substantive consolidation should  not be used "offensively to achieve advantage over one group in the plan negotiation process (for example, by deeming assets redistributed to negate plan voting rights), nor [as] a 'free pass' to spare Debtors or any other group from proving challenges, like fraudulent transfer claims, that are liberally brandished to scare yet are hard to show."[62]   Here, the Trustee seeks to use substantive consolidation to establish a framework for his fraudulent transfer claims. However, the Complaint does not allege sufficient facts to support this framework or provide the Court with a basis for drawing any reasonable inference that Worth Affiliates' operations and finances were so entangled to require substantive consolidation.[63]   The Defendants' Motions to Dismiss Count I will be granted.

B.  *Count II: Piercing the Corporate Veil*

---

[60] S*ee Owens Corning*, 419 F.3d at 212 (Discussing that lenders may structure a loan based on evaluating corporate affiliates as separate entities to determine the value of parent or subsidiaries' guarantees, rather than considering affiliates as one indistinguishable entity.)

[61] *Id.* at 211.

[62] *Id.* at 215.

[63] The Defendants also argue that the Trustee's claim is procedurally deficient and must be heard in the main bankruptcy case (rather an adversary proceeding) because all creditors of the entities to be substantively consolidated may be impacted by the relief and should be provided with notice and an opportunity to be heard on the issue. In response the Trustee argues the Debtor was the only operating entity, and the Debtor Affiliates (who were formed solely to consummate the LBO Transaction) have no creditors, or only identical creditors based on shared liabilities, that could be harmed by substantive consolidation. The Court need not decide this issue at this point in the litigation.

Count II seeks to pierce the corporate veil of the Debtor with respect to the Debtor Affiliates by alleging that the Worth Entities have no separate existence but rather operated as a single entity and enterprise. The factors that Delaware courts weigh in determining whether to disregard the corporate form and pierce the corporate veil include: (1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a facade for the dominant shareholder.[64] Courts also note that none of these factors is determinative.[65] Instead, the "ultimate decision regarding veil-piercing is largely based on some combination of these factors, in addition to 'an overall element of injustice or unfairness.'"[66] Case law teaches that "Delaware courts take the corporate form and corporate formalities very seriously" and disregard that form only in the "exceptional case."[67] Piercing the corporate veil "is a tough thing to plead and a tougher thing to get, and for good reason."[68]

Courts "will disregard the separate legal existence of a corporation where it is shown that the corporate form has been used to perpetrate a fraud or similar injustice."[69] "The fraud or injustice must, however, come from an inequitable use of the corporate form itself as a sham, and not from the underlying claim. To hold otherwise would render the fraud or injustice element

---

[64] *Manichaean Capital, LLC v. Exela Techs., Inc.*, 251 A.3d 694, 706-07 (Del. Ch. 2021) (citing *Doberstein v. G-P Indus., Inc.*, No. 9995-VCP, 2015 WL 6606484, at *4 (Del. Ch. Oct. 30, 2015)).

[65] *Id.*

[66] *Id.* at 707 (citing various cases). "Courts have also required a veil-piercing claim to demonstrate 'an overall element of injustice or unfairness.'" *Verdantus Advisors, LLC v. Parker Infrastructure Partners, LLC*, No. 2020-0194-KSJM, 2022 WL 611274, at *2 (Del. Ch. Mar. 2, 2022).

[67] *Case Fin., Inc. v. Alden*, No. 1184-VCP, 2009 WL 2581873, at *4 (Del. Ch. Aug. 21, 2009) (quotation omitted).

[68] *Verdantus Advisors,* 2022 WL 611274, at *2.

[69] *Gadsden v. Home Pres. Co.*, 2004 WL 485468, at *4 (Del. Ch. Feb. 20, 2004, revised Mar. 12, 2004).

meaningless, and would sanction bootstrapping."[70] Essentially, "the corporation must be a sham and exist for no other purpose than as a vehicle for fraud."[71]

The Trustee posits that the facts of this case are similar to the facts presented to the Delaware Court of Chancery in *Manichaean Capital*, where that court denied the defendants' motion to dismiss the veil-piercing claim. In *Manichaean*, former stockholders of a company, SourceHOV Holdings, Inc., that was acquired in a merger by Exela Technologies, Inc. sought to pierce the SourceHOV corporate veil upwards to reach Exela and downward to reach Source HOV's solvent subsidiaries to satisfy a stock appraisal judgment against SourceHOV.[72] The court noted that the complaint alleged that SourceHOV was insolvent and that its insolvency, at least in part, was the result of Exela's deliberate undercapitalization of SourceHOV.[73] The court also found that plaintiffs had successfully alleged various facts that showed Exela's failure to observe corporate formalities, including that the personnel for both entities overlapped significantly.[74]

The Trustee argues that, as in *Manichaean*, the Debtor here was left insolvent and undercapitalized by the LBO Transaction.[75]  The Complaint also alleges that the Debtor and the other Worth Entities had overlapping personnel, including directors and officers, [76] such that it would be unfair and inequitable to treat the Worth Entities as separate entities from the Debtor.

In *Manichaean*, however, the complaint contained particularized allegations detailing how SourceHOV was a mere instrumentality of Exela. Specifically, the complaint alleged that

---

[70] *Cleveland-Cliffs Burns Harbor LLC v. Boomerang Tube, LLC*, No. 2022-0378-LWW, 2023 WL 5688392, at *6 (Del. Ch. Sept. 5, 2023) (internal citations and punctuation omitted).
[71] *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999).
[72] *Manichaean,* 251 A.3d at 700.
[73] *Id.* at 707.
[74] *Id.* at 708.
[75] Compl. ¶¶ 119-132.
[76] Compl. ¶ 138.

SourceHOV Holdings had no direct operating assets, no bank account, money market account, or brokerage account.[77] Further, that complaint detailed how the parties ignored corporate formalities by alleging that Exela (i) was headquartered at the same address as the acquired entity, SourceHOV Holdings, (ii) referred to itself and its subsidiaries as one combined enterprise in SEC filings, (iii) required SourceHOV Holdings to obtain Exela's consent before SourceHOV Holdings could pay its creditors; (iv) failed to maintain proper business registrations; (v) shared a significant number of overlapping personnel, who were identified with specificity, and (vi) caused all of SourceHOV Holdings' subsidiaries cashflow to be diverted to Exela when a large appraisal judgment against SourceHOV Holdings appeared imminent.[78]

Here, no allegations in the Complaint approach the level of detail present in *Manichaean*. The Trustee argues that the following allegations establish that the Worth Entities had no separate existence, but rather operated as a single entity:

(i)    The Debtor Affiliates exercise complete control and domination over the Debtor such that they have no legal existence separate and distinct from the Debtor. (Compl. ¶ 135).

(ii)    Subsequent to the LBO Transaction, a number of individuals served as a director, officer, and/or manager of one of the Worth Entities concurrently while serving the same role with another one of the Worth Entities. (Compl. ¶ 138).

(iii)    With the assistance of high-level management personnel of the Debtor, the Worth Entities exercised such a high degree of domination and control over the Debtor such that the Worth Entities have no separate existence but rather operate as a single entity and enterprise. (Compl. ¶ 154).

(iv)    There is a unity of interest and ownership between the Worth Entities such that the separate personalities of the corporations and the owners no longer exist. (Compl. ¶ 155).

(v)    The other Worth Entities are mere instrumentalities, agents, and/or alter egos of the Debtor that have no legal existence or purpose separate and distinct from the Debtor. (Compl. ¶ 156).

---

[77] *Manichaean,* 251 A.3d at 707.
[78] *Id.* at 708.

(vi)    Further the Debtor was left undercapitalized relative to the Debtor's undertakings, including, but not limited to, entering into the SPA. (Compl. ¶ 157).

(vii)   To treat the other Worth Entities as separate entities from the Debtor would severely prejudice the Debtor's creditors, as it would shield the Catterton and/or CMPV from liability on certain causes of action, including, without limitation, transfers that would otherwise be avoidable if the Worth Entities were consolidated. (Compl. ¶ 158).

Although the Complaint includes some factual allegations to support its argument that the Debtor was left undercapitalized or insolvent after the LBO Transaction,[79] there are no specific allegations regarding how the Worth Entities ignored corporate formalities or how any of the Worth Entities were mere instrumentalities of another. For example, the Trustee's allegation about overlapping personnel (Compl. ¶ 138, above) does not identify any individuals or their roles within the various corporations.[80]   Likewise, the broad allegations that the Debtor Affiliates exercised dominion and control over the Debtor (Compl. ¶¶ 135, 154) or were "mere instrumentalities, agents, and/or alter egos" of the Debtor (Compl. ¶ 156) provide no factual details to support the statements. The allegations fall far short of the specificity that led the *Manichaean* court to accept the plaintiff's allegations as plausible.

The conclusory allegations in the Complaint, without specific details concerning the relationships and transactions between the Defendants and the Debtor, are not entitled to the presumption of truth at the motion to dismiss stage.[81]   The Complaint's allegations do not

---

[79] *See* Compl. ¶¶ 119-132, 157.

[80] Moreover, the Trustee must allege facts showing more than overlapping personnel. *See In re Champion Enters., Inc.,* 2010 WL 3522132, at *10 (Bankr. D. Del. Sept. 1, 2010) (mere fact that the same employees of parent and subsidiary managed the transactions at issue was insufficient to pierce the corporate veil); *Wenske v. Blue Bell Creameries, Inc.*, 2018 WL 5994971, at *7 (Del. Ch. Nov. 13, 2018) (allegations that a parent corporation wholly owns a subsidiary and shares officers and directors, with conclusory allegations of domination and control, cannot overcome the presumption of corporate separateness).

[81] Allegations that are "no more than conclusions are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.   "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.*

support the exceptional relief of piercing the corporate veil and the Defendants' motions to dismiss Count II will be granted.[82]

### C. Count III: Collapsing the Transactions

In Count III of the Complaint, the Trustee seeks to collapse each stage of the LBO Transaction (including the Monroe Loan, the SPA, the Closing Distributions, and distributions to Rothschild and the Former Equity Holders) and treat them as one integrated transaction for the purpose of determining whether there has been a fraudulent transfer. The Trustee argues that the component transactions were all part of a single transaction in which the Debtor's equity interests were transferred to a new owner, over $39 million was transferred to the Former Equity Holders, and the Debtor was saddled with over $25 million of secured debt which it had no ability to repay. The Defendants, however, move to dismiss Count III, again claiming that the Trustee's allegations are based on conclusory statements that restate the elements courts rely on for collapsing transactions without providing any factual support for those statements.

The Third Circuit "has recognized the propriety of collapsing multiple transactions and treating them as one integrated transaction for the purpose of assessing a defendant's fraudulent transfer liability."[83]

> This treatment is usually accorded in situations where a debtor who has exchanged property with another for fair consideration then gratuitously transfers that consideration to a third-party. When the series of transactions are completed, the debtor remains with nothing while the counter-party to the first transaction receives

---

[82] *See, e.g.*, *In re Simplexity, LLC*, 2017 WL 65069, at *9 (D. Del. Bankr. Jan. 5, 2017) (dismissing veil-piercing claim, writing: "[t]he Trustee's allegations that Versa operated Debtors as a 'single unit' while insolvent are not facts but conclusory allegations which do not satisfy the *Iqbal* and *Twombly* standards."); *Wenske*, 2018 WL 5994971, at *7 (conclusory allegations that the parent's management exclusively dominated and controlled the subsidiary's management will not suffice to state a claim for veil-piercing).

[83] *Off'l Comm. of Unsecured Creditors v. The CIT Group/Business Credit, Inc. (In re Jevic Holding Corp.)*, 2011 WL 4345204, at *4 (Bankr. D. Del. Sept. 15, 2011) (citing *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1301-03 (3d Cir. 1986)).

the property and the counter-party to the second transaction receives the consideration.[84]

A leveraged buyout is "the classic context in which courts have collapsed multiple transactions for the purpose of assessing and finding fraudulent transfer liability."[85]

To determine whether a series of transactions should be "collapsed" and viewed as a single integrated transaction, courts focus on the substance rather than on the form of the transactions and consider the overall intent and impact of the transactions.[86] In making this determination, courts have considered the following factors: whether all parties involved in the individual transactions had knowledge of the other transactions; whether each transaction sought to be collapsed would have occurred on its own; and whether each transaction was dependent or conditioned on the other transactions.[87]

Here, the Trustee alleges that the various LBO Transactions were orchestrated and worked as a single transaction, with the intent of defrauding the Debtor's creditors. The Trustee cites to the following paragraphs in the Complaint to support his assertion that all parties involved in the individual transactions had knowledge of the other transactions:

(i)     The parties to the Monroe Credit Agreement and the LBO Transaction had knowledge of such other transaction. (Compl. ¶ 167).

(ii)    The parties to the Monroe Credit Agreement and Stock Transfer had knowledge of such other transaction. (Compl. ¶ 168).

(iii)   The parties to the Monroe Credit Agreement and the Rothschild Distribution had knowledge of such other transaction. (Compl. ¶ 169).

---

[84] *Off'l Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co., Inc. (In re Sunbeam Corp.)*, 284 B.R. 355, 370 (Bankr. S.D.N.Y. 2002) (citing *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995).

[85] *Jevic*, 2011 WL 4345204, at *4 (citing *Tabor*, 803 F.2d at 1302; *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995) ("This [collapsing] approach finds its most frequent application to lenders who have financed leveraged buyouts of companies that subsequently become insolvent."); *see also Mervyn's LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings, LLC)*, 426 B.R. 488, 498 (Bankr. D. Del. 2010); *Rosener v. Majestic Mgmt. (In re OODC, LLC)*, 321 B.R. 137-138 (Bankr. D. Del. 2005).

[86] *See Jevic*, 2011 WL 4345204, at *5.

[87] *Id; see also The Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co.)*, 327 B.R. 537, 546-47 (D. Del. 2005); *Mervyn's Holdings*, 426 B.R. at 497.

(iv)     The parties to the Monroe Credit Agreement and the Equity Distributions had
         knowledge of such other transaction. (Compl. ¶ 170).

(v)      The parties to the Monroe Credit Agreement and the Closing Distributions had
         knowledge of such other transaction. (Compl. ¶ 171).

The Trustee also cites to the following paragraphs in the Complaint to support his

assertion that none of the LBO Transactions would have occurred on their own; instead, each of

the LBO Transactions was dependent or conditioned on the other transactions occurring:

(i)      The Monroe Loan and the LBO Transaction would not have occurred alone.
         (Compl. ¶ 172).

(ii)     The Monroe Loan and the Stock Transfer would not have occurred alone. (Compl.
         ¶ 173).

(iii)    The Monroe Loan and the Rothschild Distribution would not have occurred alone.
         (Compl. ¶ 174).

(iv)     The Monroe Loan and the Equity Distributions would not have occurred alone.
         (Compl. ¶ 175).

(v)      The Monroe Loan and the Closing Distributions would not have occurred alone.
         (Compl. ¶ 176).

The Trustee also argues that the Complaint alleges that each of the transactions was

executed in furtherance of a common purpose: the fraudulent LBO Transaction, which ultimately

enriched, among others, the Defendants, at the expense of the Debtor's creditors.  He argues that

the unique structure of the LBO Transaction is a dispositive fact because it was that leverage

which left the Debtor unable to pay its creditors after the Closing Distributions were transferred

to Defendants, thus effectively leaving the Debtor's creditors to foot the bill.

As noted above, it is not unusual for courts to collapse transactions in an LBO context to

assess fraudulent transfer liability.[88]  But the Trustee's broad allegation that the result of the

LBO Transactions was unfair to the Debtor's creditors cannot, on its own, provide the factual

support needed for collapsing transactions.  The Court agrees with the Defendants that the

---

[88] *See* nn. 84-85, *supra.*

Complaint's recitals of the elements of the collapsing doctrine are not sufficient at this stage to support the claim in Count III.[89]   Accordingly Count III will be dismissed.

## **CONCLUSION**

For the reasons stated above, the Court concludes that Counts I, II, and III do not allege sufficient facts to support the underlying claims for relief.  Accordingly, the Court will **GRANT** the Defendants' Motions to Dismiss Counts I, II, and III of the respective Complaints, but the Court will grant the Trustee 60 days to file amended complaints to address the pleading deficiencies.  An appropriate Order follows.

FOR THE COURT:

Brendan Linehan Shannon
UNITED STATES BANKRUPTCY JUDGE

Dated: December 19, 2024
Wilmington, Delaware

---

[89] The Defendants also argue that Count III should be dismissed because the collapsing doctrine only collapses transactions, but it does not collapse *entities* or enable a court to pierce the corporate veil or disregard corporate separateness.  In short, the Defendants argue that collapsing transactions will not permit the Trustee to pursue transfers made by a non-debtor as fraudulent transfers.  The Defendants rely, in part, on *DSI Renal*: "[C]ollapsing the Restructuring transactions for these purposes does not expand the property rights of the Debtors such that the Trustee may recover property (or the value thereof) to which the Debtors were never entitled pre-Restructuring."  *Giuliano v. Schnabel (In re DSI Renal Holdings, LLC)*, 617 B.R. 496, 505 (Bankr. D. Del. 2020). The Trustee, however, argues that the alleged fraudulent transfers in *DSI Renal* and other cases relied on by the Defendants were not structured as leveraged buy-outs.  Instead, the Trustee relies upon *OODC*, in which the court did not dismiss a collapsing claim, writing: "In deciding whether to 'collapse' a series of transactions into one integrated transaction, the issue is not whether there was common ownership on both sides of the transaction or whether the transfer was a stock or an asset sale, but rather whether there was an overall scheme to defraud the estate and its creditors by depleting all the assets through the use of a leveraged buyout."  *OODC*, 321 B.R. at 138.  Because the Court finds that there are insufficient factual allegations to support Count III, the Court does not reach this issue at this time.