## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>*The Worth Collection, Ltd.*,<br><br>Debtor. | Chapter 7<br><br>Case No. 20-10337 (BLS) |
| DOUGLAS T. TABACHNIK, in his capacity as the chapter 7 trustee of the bankruptcy estate of The Worth Collection, Ltd.,<br><br>Plaintiff,<br><br>v.<br><br>JAY ROSENBERG; DAVID D. DEFEO; SETH GROSSMAN; BRIAN MCGEE; JASON NEIMARK; JOHN DISA; FRANCINE DELLA BADIA; MICHAEL GILSON; ART LORENZ; KELLY COLLINS; JOSEPHINE AMISTOSO; SUSAN GUSTAFSON; and JOHN DOES 1-10; DOE CORPORATIONS 1-10; DOE LIMITED PARTNERSHIPS 1-10; and DOE LIMITED LIABILITY COMPANIES 1-10,<br><br>Defendants. | Adv. Proc. No. 23-50316 (BLS) |

## COMPLAINT[1]

Douglas T. Tabachnik, solely in his capacity as the chapter 7 trustee appointed in the above-captioned bankruptcy case (the "*Trustee*"), and as plaintiff in the above-captioned adversary proceeding, hereby alleges, upon his own knowledge or upon information and belief, as follows:

---

[1] This Amended Complaint is subject to the arguments made in the Trustee's *Motion for Clarification or Amendment of Order and Accompanying Opinion Granting, in Part, Motions to Dismiss* which motion has been fully briefed but not yet decided by the Court.

## PRELIMINARY STATEMENT

1.     The Trustee brings this action under state law claims of breach of fiduciary duty, loyalty, and care against the Debtor's post-LBO Transaction D&Os (as defined below). The Trustee also brings preferential and fraudulent transfer claims against the Debtor's former D&Os. This matter involved, without limitation, Worth Collection Intermediate Holdings, LLC ("*Intermediate*"), Worth Investment Holdings, LLC ("*WIH*"), NWC Worth Collection Holdings, LLC ("*NWCWCH*," and together with Intermediate and WIH, the "*Debtor Affiliates*," and together with the Debtor, the "*Worth Entities*"), and New Water Capital Partners, L.P. ("*New Water*," and together with the Debtor Affiliates, the "*NWC Entities*").

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334, and Plaintiff consents to entry of a final order or judgment by the Bankruptcy Court in this matter.

3.     Venue is proper in this district under 28 U.S.C. § 1409(a).  This adversary proceeding is related to a chapter 7 bankruptcy case currently pending in this district, captioned as *In re The Worth Collection Ltd.*, Case No. 20-10337 (BLS) (the "*Chapter 7 Case*").

4.     This matter is a core proceeding pursuant to, without limitation, 28 U.S.C. §§157(b)(2)(A), (C), and (O).

5.     Alternatively, this Court has subject matter jurisdiction under 28 U.S.C. §1332(a)(1) because it is between citizens of different states and the amount in controversy exceeds $75,000.

6.     To the extent this Complaint sets forth causes of action that are not core proceedings, the Trustee consents, pursuant to 28 U.S.C. § 157(c)(2), to this Court hearing and determining such matters.

## PARTIES

### A.    Plaintiff

7.      The Trustee is the chapter 7 trustee appointed to administer the Debtor's bankruptcy estate in the Chapter 7 Case.

### B.    Defendants

8.      Upon information and belief, Jay Rosenberg ("*Rosenberg*") is an individual residing in New York, New York and was a director and/or officer of the Worth Entities subsequent to the LBO Transaction.

9.      Rosenberg was an equity holder of the Debtor and received a distribution in connection with the LBO Transaction (as defined *infra*).

10.     Upon information and belief, David DeFeo ("*DeFeo*") is an individual residing in Ridgewood, New Jersey and was a director and/or officer of the Worth Entities subsequent to the LBO Transaction.

11.     DeFeo was an equity holder of the Debtor and received a distribution in connection with the LBO Transaction.

12.     Upon information and belief, Seth Grossman ("*Grossman*") is an individual residing in Ridgewood, New Jersey and was a director and/or officer of the Worth Entities subsequent to the LBO Transaction.

13.     Grossman was an equity holder of the Debtor and received a distribution in connection with the LBO Transaction.

14.     Upon information and belief, Brian McGee ("*McGee*") is an individual residing in Boca Raton, Florida and was a director and/or officer of the Worth Entities subsequent to the LBO Transaction.

15.     Upon information and belief, Jason Neimark ("*Neimark*") is an individual residing in Boca Raton, Florida and was a director and/or officer of the Worth Entities subsequent to the LBO Transaction.

16.     Upon information and belief, John Disa ("*Disa*") is an individual residing in Boca Raton, Florida and was a director and/or officer of the Worth Entities subsequent to the LBO Transaction.

17.     Upon information and belief, Francine Della Badia ("*Della Badia*") is an individual residing in New York, New York and was a director and/or officer of the Worth Entities subsequent to the LBO Transaction.

18.     Upon information and belief, Michael Gilson ("*Gilson*") is an individual residing in New York, New York and was a director and/or officer of the Worth Entities subsequent to the LBO Transaction.

19.     Upon information and belief, Art Lorenz ("*Lorenz*") is an individual residing in New York, New York and was a director and/or officer of the Worth Entities subsequent to the LBO Transaction.

20.     Upon information and belief, Kelly Collins ("*Collins*") is an individual residing in Chicago, Illinois and was a director and/or officer of the Worth Entities subsequent to the LBO Transaction.

21.     Upon information and belief, Josephine Amistoso ("*Amistoso*") is an individual and was a director and/or officer of the Worth Entities subsequent to the LBO Transaction.  The citizenship of Amistoso is unknown, but can and will be ascertained through discovery.

22.     Upon information and belief, Susan Gustafson ("*Gustafson*," and together with Rosenberg, DeFeo, Grossman, McGee, Neimark, Disa, Della Badia, Gilson, Lorenz, Collins,

Amistoso, the "*D&Os*") is an individual and was a director and/or officer of the Worth Entities subsequent to the LBO Transaction.  The citizenship of Amistoso is unknown, but can and will be ascertained through discovery.

23.    Defendants John Does 1-10 are other individuals who, upon information and belief, are subsequent transferees of the fraudulent transfers described herein. The true identities and citizenship of John Does 1-10 are unknown, but can and will be ascertained through discovery.

24.    Defendants Doe Corporations 1-10 are other corporations who, upon information and belief, are subsequent transferees of the fraudulent transfers described herein. The true identities and citizenship of Doe Corporations 1-10 are unknown, but can and will be ascertained through discovery.

25.    Defendants Doe Limited Partnerships 1-10 are other limited partnerships who, upon information and belief, are subsequent transferees of the fraudulent transfers described herein. The true identities and citizenship of Doe Limited Partnerships 1-10 are unknown, but can and will be ascertained through discovery.

26.    Defendants Doe Limited Liability Companies 1-10 are other limited liability companies who, upon information and belief, are subsequent transferees of the fraudulent transfers described herein. The true identities and citizenship of Doe Limited Liability Companies  1-10 are unknown, but can and will be ascertained through discovery.

27.    The Trustee has attempted to identify the roles of each of the above individuals. However, to the extent the Trustee finds out that one or more of these individuals had other roles in the Worth Entities (for example, sat on the board or was an officer or director), the Trustee reserves all rights to bring any claims that would arise from such person's additional role.

**C.    Other Relevant Parties**

28.    Upon information and belief, Catterton Management Company, L.L.C. ("*Catterton*") is a Delaware limited liability company having a principal place of business at 599 West Putnam Avenue, Greenwich, Connecticut.

29.    Upon information and belief, Catterton Managing Partner V, L.L.C. ("*CMPV*") is a Delaware limited liability company having a principal place of business at 599 West Putnam Avenue, Greenwich, Connecticut.

30.    Upon information and belief, The Worth Collection Holdings, LLC ("*Holdings*") is a Delaware limited liability company having a principal place of business at 599 West Putnam Avenue, Greenwich, Connecticut.

31.    Upon information and belief, Worth Acquisition, LLC ("*Acquisition*," and collectively with Holdings and CMPV, the "*Catterton SPV's*") is a Delaware limited liability company having a principal place of business at 599 West Putnam Avenue, Greenwich, Connecticut.

32.    Upon information and belief, Caroline Davis ("*Davis*") is an individual residing in Nashville, Tennessee.

33.    Davis was an equity holder of the Debtor and received a distribution in connection with the LBO Transaction.

34.    Upon information and belief, Diana Manley ("*Manley*") is an individual residing in New York, New York.

35.    Manley was an equity holder of the Debtor and received a distribution in connection with the LBO Transaction.

36.     Upon information and belief, Wendy Selig-Prieb ("*Selig-Prieb*") is an individual residing in Scottsdale, Arizona.

37.     Selig-Prieb was an equity holder of the Debtor and received a distribution in connection with the LBO Transaction.

38.     Upon information and belief, Courtney Denby ("*Denby*") is an individual residing in Dallas, Texas.

39.     Denby was an equity holder of the Debtor and received a distribution in connection with the LBO Transaction.

40.     Upon information and belief, Andrea Weiss ("*Weiss*") is an individual residing in Eustis, Florida.

41.     Weiss was an equity holder of the Debtor and received a distribution in connection with the LBO Transaction.

42.     Upon information and belief, Lamira Fondren ("*Fondren*") is an individual residing in Greenville, South Carolina.

43.     Fondren was an equity holder of the Debtor and received a distribution in connection with the LBO Transaction.

## **BACKGROUND**

### A.     **General Background**

44.     On February 14, 2020 (the "*Petition Date*"), an involuntary petition was filed against The Worth Collection, Ltd. (the "*Debtor*") under chapter 7 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "*Bankruptcy Code*") in the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*"), thereby commencing the Chapter 7 Case.

45.     On March 24, 2021 (the "*Relief Date*"), the Bankruptcy Court entered an Order for Relief against the Debtor, thereby allowing the Chapter 7 Case to proceed.

46.     On June 23, 2021, the Bankruptcy Court entered an order appointing the Trustee as the chapter 7 trustee to administer the Chapter 7 Case.

**B.     Introduction**

47.     This action stems from the disastrous leveraged buyout undertaken by the Debtor, which loaded the Debtor with enormous and unsustainable loan obligations — more than $25 million in new debt — and encumbered all of its assets, while funneling the proceeds of that debt to, among others, Defendants.

48.     In exchange, the Debtor was left with just over $1 million in cash, which was immediately grossly insufficient to cover its operating cost and service its post-LBO debt obligations.

49.     Ultimately, as intended, the Debtor's non-insider and unsecured creditors were left without recourse.  The Defendants in this adversary complaint and related adversary complaints walked away with over $39 million in proceeds from the LBO Transaction, all at the expense of the Debtor and the Debtor's unsecured creditors.

50.     Catterton and the Former Equity Holders (as defined *infra.*), and later New Water, accomplished this by designing a corporate structure to shield equity holders at the top while shifting all risk to the Debtor's creditors in an attempt to make the LBO Transaction bankruptcy-remote and fraudulent-transfer proof.

51.     The structure put in place by Catterton and later preserved by New Water was intentionally designed to enable the Defendants to benefit from any upside that the leveraged transaction may have yielded, without shouldering any of the risk of the leveraged transaction.

52.     The Defendants sought to do this by endeavoring to maintain as much non-insider and unsecured trade debt at the operating company (*i.e.*, the Debtor) to evade creating any plaintiffs

or involuntary bankruptcy petitioning creditors with standing to challenge the action of the Defendants in this, and related, adversary proceedings.

53.     By insulating the Debtor via a layered ownership structure from the true equity holders (such as Catterton, the Former Equity Holders, and New Water) and other entities which functioned as equity holders (such as Monroe, as defined *infra.*), the parent entities thus attempted to insulate themselves from trade creditors and potential liability.

54.     Thus, the general creditors of this business that were not at the operating company level were either ostensible senior secured lenders or insiders of the Debtor.

55.     This exact leveraged buyout structure was used to shield related entities and individuals, such as Catterton, New Water, and the various Defendants in this, and related, adversary proceedings, from liability.

56.     Here, the LBO Transaction resulted in the Debtor amassing a mountain of unpaid debt to the detriment of the innocent creditors upon whose shoulders the risk of the leveraged buyout (and subsequent events) fell, ultimately compelling the filing of this involuntary bankruptcy proceeding.

## C.    Factual Background

### *The Debtor's Historical Background and its Prior Owners*

57.     Founded in 1991, the Debtor was a direct-to-consumer women's fashion and apparel company marketed under 'Worth New York' and 'W by Worth' brand names.  The Debtor sold women's apparel principally through a network of sales representatives (which the Debtor referred to as "stylists"), as well as via other avenues.

58.    Prior to 2016, the Debtor did business under the corporate entity name *The Worth Collection, Inc.*, which eventually changed form to become the successor entity *The Worth Collection, Ltd.*, *i.e.,* the Debtor.[2]

59.    Prior to September 2016, Holdings, an entity affiliated with CMPV and Catterton, owned all of the issued and outstanding stock of the Debtor.

60.    Holdings was, in turn, owned by the following equity holders (collectively, the "*Former Equity Holders*" or "*Initial Transferees*," listed in order of volume of shares):

    a.    Acquisition;

    b.    Davis;

    c.    Rosenberg;

    d.    DeFeo;

    e.    Grossman;

    f.    Manley;

    g.    Selig-Prieb;

    h.    Denby;

    i.    Weiss; and

    j.    Fondren.

61.    As noted above, Acquisition was the largest shareholder of Holdings, and the equity of Acquisition was held by CMPV.  CMPV is thus the sole shareholder of Acquisition and, indirectly, the largest shareholder of Holdings.

**Pre-LBO Control of the Debtor**

62.    Prior to the LBO Transaction, the Debtor was controlled by Catterton and CMPV.

---

[2] Except as where otherwise indicated herein, The Worth Collection, Inc. and The Worth Collection, Ltd. are referred to throughout as "the Debtor."

63.     On October 12, 2006, Catterton and The Worth Collection, Inc. executed a certain Management Services Agreement (the "*Catterton Management Agreement*").

64.     Upon information and belief, under the terms of the Catterton Management Agreement, Catterton exercised control over The Worth Collection, Inc., and its successor entity, the Debtor, in exchange for fees paid to Catterton.

65.     The senior partner leading this relationship on behalf of Catterton was Michael Farello.

66.     Through their equity, the Catterton Management Agreement, and, upon information and belief, other related agreements, Catterton and CMPV owned and exercised control over the Debtor prior to the LBO Transaction.

### The Debtor's Pre-LBO Financial State

67.     Beginning in 2015, the Debtor faced a number of challenges that hampered its financial growth.

68.     From 2012 through 2015, the Debtor's financial performance generally plateaued.

69.     From 2012 through 2015, the Debtor's revenues and profits remained flat as a result of a stagnant stylist count, difficulty attracting new stylists and growing the revenue of existing stylists, and an aging customer base.

70.     However, despite these challenges, the Debtor was profitable during this period.

71.     The Debtor's audited financial statements show positive yearly net income in each of 2012, 2013, and 2014, and the Debtor experienced a gradual growth in the total value of shareholder equity during this period.

72.     In addition, while the Debtor's EBITDA was generally stagnant from 2013 through 2015, with no significant increase or decrease, the Debtor remained profitable.

### *Retention of Rothschild and Solicitation of Interested Purchasers*

73.     At the beginning of 2016, the Debtor's Former Equity Holders, led by Catterton and the Catterton SPVs, began to explore a sale of the Debtor.

74.     Around the same time, the Debtor's Former Equity Holders retained Rothschild to serve as a financial consultant and investment banker in connection with a sale of the Debtor or the Debtor's business.

75.     To effectuate a sale of the Debtor or the Debtor's business, Rothschild was retained for the purpose of, among other things, soliciting the interest of potential purchasers, evaluating bids from prospective purchasers, and assembling and preparing financial "due diligence" documents and other marketing materials.

76.     In connection with Rothschild's marketing of the Debtor, Rothschild and the Debtor created future growth models of the Debtor for presentations to the Debtor's management and interested parties.

77.     Rothschild and the Debtor's growth models reflected unrealistic future growth projections for the Debtor.  For example, certain models used for these presentations showed projected sales revenue growth for the Debtor of 10.0% in 2017, 12.6% in 2018, and 13.0% in 2019. However, in the years from 2013 through 2016, the Debtor had never exceeded 5.2% revenue growth in any given year, and most years showed significantly lower growth than this.

78.     Throughout the sale process, the Debtor, Rothschild, Catterton and the Catterton SPVs worked together collaboratively to market the Debtor to interested third parties.

### *New Water Capital Partners Responds to Rothschild's Solicitation*

79.     New Water was one of several parties that expressed interest in purchasing the Debtor, and ultimately the entity that led the purchase of the Debtor (via several subsidiary

entities).

80.     New Water is a private equity firm based headquartered at 2424 N. Federal Hwy,

Suite #418, Boca Raton, FL 33431.

81.     New Water focuses on investments in lower-middle market companies, and New

Water has a history of targeting retail and consumer products companies for its investments.

82.     The New Water partners leading the investigation of a potential leveraged buy-out

of the Debtor and ultimately executing the LBO Transaction on behalf of New Water were

Neimark, McGee, and Disa (collectively, the "*New Water Partners*" or each a "*Partner*").

### The Final Bid Summary

83.     In June 2016, Rothschild prepared a "final bid summary" outlining two potential

offers to purchase the Debtor, one from Hypatia Capital ("the *Hypatia Offer*"), and another from

New Water (the "*New Water Offer*," and together with the Hypatia Offer, the "*Final Offers*").

84.     The key terms of the Final Offers are summarized in the chart on the following

page:

|  | **Hypatia Offer** | **New Water Offer** |
|---|---|---|
| Underlying Metrics Proposed by Purchaser | $30.81mm valuation (calculated as a five-multiple of (5x) purchaser's proposed adjusted EBITDA of $6.162mm) | $41.0mm valuation (calculated as a six-multiple of (6x) purchaser's proposed adjusted EBITDA of $6.8mm) |
| Percentage Acquired | 100% | 100% |
| Funding Sources | - Purchaser funding<br><br>- Up to a $21.8mm loan facility ($18.8mm term loan, $3.0mm revolver)<br><br>- Leverage at closing not to exceed 2.25x to 2.50x LTM adjusted EBITDA including revolver, term loan, capital leases, and all other senior debt | - Purchaser funding<br><br>- Up to a $27.5mm loan facility ($23.5mm term loan, $4.0mm revolver)<br><br>- Leverage at closing not to exceed 3.5x TTM adjusted EBITDA including revolver and term loan |
| Assumptions underlying valuation | - 2015 adjusted EBITDA of $6.162mm excludes marketing expenditures, showroom operations, salesforce personnel changes, and other personnel expenditures (represents a 5.0x EBITDA multiple) | - TTM as of April 2016 net revenue of $78.2m and adjusted EBITDA of $6.8mm (excludes recurring marketing expenditures previously included as New Venture add-backs)<br><br>- On track to achieve 2016 net revenue of $82.5mm and adjusted EBITDA of $7.9mm<br><br>- Company to achieve DBD and agency forecast in 2016 |
| Employment agreements | None | - Requested key employment agreements with current management<br><br>- Equity incentive plan of up to 10% for key senior management |

85. As outlined above, the Hypatia Offer and the New Water Offer differed in several respects.

86. The New Water Offer was based on a valuation of the Debtor's business at a higher multiple of EBITDA than the Hypatia Offer.

87. The New Water Offer was based on a higher assessment of the Debtor's adjusted EBITDA than the Hypatia Offer.

88.     The New Water Offer was based on funding the transaction with more debt than the Hypatia Offer.

89.      Rothschild's "final bid summary" outlining the Final Offers to purchase the Debtor did <u>not</u> indicate that the Hypatia Offer was based on post-closing projections.

90.     Rothschild's "final bid summary" outlining the two potential offers to purchase the Debtor did indicate that the New Water Offer was based on post-closing projections.

91.     The Former Equity Holders accepted the New Water Offer, rather than the Hypatia Offer.

92.     New Water thus began the process to purchase the Debtor through a complex leveraged buyout, which involved a series of underlying transactions involving numerous entities.

### The LBO Transaction

93.     On or about September 29, 2016 (the "*LBO Transaction Date*"), the Debtor consummated a series of transactions (collectively, the "*LBO Transaction*") pursuant to which, among other things, the Debtor's equity interests were transferred to and acquired by New Water or entities related to New Water and the Debtor took on over twenty-five million dollars ($25,000,000) of secured debt:

### a.     The Stock Purchase

94.     On the LBO Transaction Date, the Debtor, Holdings, DeFeo, and the members of Holdings (collectively, the "*Sellers*"), CMPV (as seller representative), and Worth Collection Intermediate Holdings, LLC ("*Worth Intermediate*") entered into a Stock Purchase Agreement dated September 29, 2016 (the "*SPA*").

95.     The SPA was signed by DeFeo, Rosenberg, and Davis, and McGee, among others.

96.     Worth Intermediate was a special purpose holding company established by New Water to acquire all the issued and outstanding shares of capital stock of the Debtor.

97.     While Worth Intermediate was a legally distinct entity from the Debtor, Worth Intermediate and the Debtor had no meaningfully separate existence, and both entities were dominated by New Water and its Partners, including Neimark, McGee, and Disa.

98.     Pursuant to the SPA, Worth Intermediate acquired all the issued and outstanding shares of capital stock of the Debtor (the "*Stock Transfer*").

99.     The purchase price of the Stock Transfer was payable by Worth Intermediate and was equal to forty-million dollars ($40,000,000) plus cash on hand, plus or minus the amount, if any, by which preliminary working capital was greater than or less than target net working capital, minus all indebtedness of the Debtor, minus certain expenses (the "*Purchase Price*").

100.    New Water funded twenty-million dollars ($20,000,000) at the closing of the LBO Transaction.

### b.      The LBO Transaction Loans

101.    New Water, either directly or indirectly, caused the Debtor and one or more of Worth Intermediate or Worth Investment Holdings, LLC ("*WIH*") to enter into the following financing agreements:

### i.      *Niagara/KeyBank Loan*

102.    On the LBO Transaction Date, the Debtor and Worth Intermediate (together, the "*Borrowers*") entered into that certain Amended and Restated Credit and Security Agreement (the "*First Niagara Credit Agreement*") with First Niagara Commercial Finance, Inc. ("*First Niagara*"), whereby First Niagara Bank issued a line of credit in the amount of $10,000,000 (the "*Niagara/KeyBank Loan*") for the purposes of (i) funding the Stock Transfer; (ii) paying fees and expenses in connection with the Stock Transfer, including certain expenses incurred by First

Niagara and/or other lenders; (iii) repaying certain outstanding debt of the Debtor on the date of the Stock Transfer; (iv) facilitating the issuance of certain letters of credit; and (v) providing working capital to the Debtor for general corporate purposes.

103. At the closing of the LBO Transaction, the Debtor granted a first-priority security interest in the Debtor's operating assets to First Niagara, and the Debtor granted a second-priority security interest in the Debtor's intellectual property assets to First Niagara.

104. While both Worth Intermediate and the Debtor were Borrowers under the First Niagara Credit Agreement, there was no delineation of responsibility for amounts due from either entity — the loan amounts were commingled as if Worth Intermediate and the Debtor were a single entity.

### ii. Monroe Loan

105. On the LBO Transaction Date, the Debtor and Worth Intermediate entered into that certain Term Loan Credit and Security Agreement (the "*Monroe Credit Agreement*") administered by Monroe Capital Management Advisors, LLC ("*Monroe*").

106. Pursuant to the Monroe Credit Agreement, Worth Intermediate obtained funding in the amount of $22,379,000 from the Monroe Facility (the "*Monroe Loan*"), to partially fund the Purchase Price.

107. At the closing of the LBO Transaction, the Monroe Credit Agreement provided for one or more term loans which were to be partially amortized, with a substantial balloon payment to be due on September 29, 2021.

108. At the closing of the LBO Transaction, the Debtor granted a first-priority security interest in the Debtor's intellectual property assets to Monroe, and the Debtor granted a second-priority security interest in the Debtor's operating assets to Monroe.

109.    Under the Monroe Credit Agreement, Worth Intermediate and the Debtor were both listed as Borrowers and there was no delineation of responsibility for amounts due from either entity — the loan amounts were commingled as if Worth Intermediate and the Borrower were a single entity.

### iii.    LBO Obligations and Liens

110.    Upon the closing of the LBO Transaction, First Niagara and Monroe asserted secured loans (the "*LBO Obligations*") in the aggregate of over twenty-five million dollars ($25,000,000) collateralized by security interests in the Debtor's assets.

111.    The Niagara/KeyBank Loan was later assigned to KeyBank National Association ("*KeyBank*"), First Niagara's successor by merger.

### c.    The New Water Consulting Agreement

112.    On the LBO Transaction Date, Worth Intermediate and New Water also entered into a consulting agreement (the "*Consulting Agreement*").

113.    The Consulting Agreement provided, among other things, that Worth Intermediate would pay an annual fee to New Water equal to the greater of (i) $350,000 and (ii) 4% of EBITDA for the applicable fiscal year.

114.    Worth Intermediate either remitted, or caused the Debtor to remit, hundreds of thousands of dollars to New Water in connection with the Consulting Agreement (the "*Consulting Fees*") at a time when the Debtor was insolvent.

115.    During the one (1) year preference period for insiders (the "*Preference Period*") preceding the Petition Date, the Trustee has received records indicating avoidable payments to New Water in the amount of at least $110,099.03.

116.    The Trustee believes that he may discover additional preferential and fraudulent transfers as his investigation continues (all such transfers are collectively referred to as the "*New Water Transfers*").

### d.    The Closing Distributions

117.    The LBO Transaction also included a series of distributions, which were made in connection with the Stock Transfer (collectively, the "*Closing Distributions*"), as follows:

| Cash Sources | | Cash Uses | |
|---|---|---|---|
| First Niagara Revolving Credit Facility | $2,900,000.00 | Closing Cash Payments to Sellers | $38,918,725.51 |
| Monroe Capital Term Loan | $22,379.000.00 | New Water Fees & Expenses | $1,371,831.05 |
| New Water | $20,000,000.00 | Escrow Amount for Working Capital | $400,000.00 |
| | | Escrow Amount for Purchase Price Escrow | $500,000.00 |
| | | Advance Amount to CMPV | $100,000.00 |
| | | Indebtedness Paid | $1,447,818.24 |
| | | Transaction Fees (including D&O tail insurance) | $1,324,960.09 |
| | | Change of Control Bonuses | $134,166.65 |
| | | 57th Street Lease Debt | $23,319.54 |
| | | Cash to Company | $1,058,178.92 |
| **Total Sources** | **$45,279,000.00** | **Total Uses** | **$45,279,000.00** |

118.    Of the $45,279,000 of Closing Distributions, over $39 million was transferred to the Initial Transferees, as follows:

| Equity Holder | Estimated Portion of Proceeds (collectively, the "*Equity Distributions*") |
|---|---|
| Acquisition | $31,654,556.16 |
| Davis | $3,222,650.13 |
| Rosenberg | $3,476,319.07 |
| DeFeo | $1,308,050.07 |
| Grossman | $115,331.29 |
| Manley | $32,951.80 |
| Selig-Prieb | $32,951.80 |
| Denby | $32,951.80 |
| Weiss | $16,481.70 |
| Fondren | $16,481.70 |
| **Total** | $39,908,725.51 |

119.    In addition, some or all of the roughly $31 million paid to Acquisition was transferred upstream to the Subsequent Transferees.

120.    Each of the Initial Transferees and Subsequent Transferees received a portion of the proceeds from the LBO Transaction in the form of equity distributions.

121.    DeFeo and Grossman received transaction bonuses of $61,250 and $52,500, respectively, for completing the LBO Transaction, above and beyond benefits they received as equity holders.

122.    Davis also received a release from certain loan obligations which she owed to the Debtor, totaling approximately $518,825, in connection with the closing of the SPA.

123.    Rosenberg, DeFeo, and Grossman remained in positions as officers of the Debtor for a period following the LBO transaction.

124.    New Water received a payment in the amount of $400,000 in connection with the LBO Transaction (the "*New Water Closing Fee*").

125.    As part of the "Transaction Fees" paid in conjunction with the LBO Transaction, Rothschild received a fee in the amount of $1,019,947.79 (the "*Rothschild Distribution*") as part of the Closing Distributions.

126.    A summary of the transactions as they relate to the LBO Transaction, broken down by each party, is provided below:

| Party | Acquired (+) | Consideration (-) |
|---|---|---|
| The Debtor | Satisfaction of $2,373,966.22 in pre-closing debt | Granting of "blanket" security interests to First Niagara and Monroe<br><br>Assumption of over $30 million in new debt<br><br>Obligations to make Consulting Fee payments to New Water |
| Worth Intermediate | All equity interests of the Debtor<br><br>Ability to borrow under the Monroe Loan to acquire all equity interests of the Debtor | Granting of "blanket" security interests to First Niagara and Monroe<br><br>Assumption of over $30 million in new debt |
| Former Equity Holders | Aggregate cash payment of $38,918,725.51 | Sale of all equity interests of the Debtor |
| New Water | Control of the Debtor<br><br>Right to receive Consulting Fee payments<br><br>Receipt of New Water Closing Fee | |

| Monroe Facility | First or second priority security interests the Debtor's assets<br><br>Right to receive payments on the Monroe Loan, including interest | The Monroe Loan |
| First Niagara | First or second priority security interests the Debtor's assets<br><br>Right to receive payments on the First Niagara Loan, including interest | |
| Rothschild | Receipt of the Rothschild Distribution | |
| DeFeo | Receipt of $61,250 transaction bonus | Sale of interests in Holdings |
| Grossman | Receipt of $52,500 transaction bonus | Sale of interests in Holdings |

### e.   Additional Related Transactions underlying the LBO Transaction

127.   New Water formed three (3) entities specifically and with the sole purpose of consummating the LBO Transaction (collectively, the "*Debtor Affiliates*," and together with the Debtor, the "*Worth Entities*"): (i) NWC Worth Collection Holdings, LLC ("*NWCWCH*"), the master vehicle and an entity wholly owned by New Water; (ii) WIH, an entity wholly owned by NWCWCH, and (iii) Worth Intermediate, the "purchaser" in the LBO Transaction, an entity wholly owned by WIH.

128.   As part of the LBO Transaction, the Worth Entities and New Water entered into several other agreements (in addition to those described above), all dated as of the LBO Transaction Date, and all of which were interconnected and dependent on the existence of the others, including but not limited to the following:

    a. The following subscription agreements (collectively, the "*Subscription Agreements*"):

       i. September 29, 2016 Subscription Agreement between NWCWCH and New Water.

       ii. September 29, 2016 Subscription Agreement between WIH and NWCWCH.

       iii. September 29, 2016 Subscription Agreement between Worth Intermediate and WIH.

    b. A Securityholders Agreement between WIH and NWCWCH dated as of September 29, 2016 (the "*Securityholders Agreement*").

129. Pursuant to each of the Subscription Agreements, each parent Worth Entity purchased the subsidiary Worth entity for $20 million:  New Water purchased NWCWCH for $20 million, NWCWCH purchased WIH for $20 million, and WIH purchased Worth Intermediate for $20 million.

130. Worth Intermediate held all shares of the Debtor, making it the owner of the Debtor.

131. Upon information and belief, the same $20 million was used by each parent Worth Entity to purchase each subsidiary Worth Entity, all the way down the chain of ownership.

132. The Securityholders Agreement described the ownership of WIH by NWCWCH and provided restrictions on the transfer of WIH Securities.

133. The Securityholders Agreement was executed for both WIH and NWCWCH by New Water Partner McGee.

134. The Securityholders Agreement indicates that NWCWCH's interests were held "c/o New Water Capital L.P."

135. Upon information and belief, there were several additional transactions consummated as part of the LBO Transaction on or around the LBO Transaction Date.

***Ownership and Control of the Debtor Subsequent to the 2016 LBO Transaction***

136.    Following and as a result of the LBO Transaction, New Water controlled the

following four entities:

      a.   NWCWCH, an entity wholly owned by New Water;

      b.   WIH, an entity wholly owned by NWCWCH;

      c.   Worth Intermediate, an entity wholly owned by WIH;

      d.   The Debtor, an entity wholly owned by Worth Intermediate.

137.    The following chart describes the ownership structure of the Debtor and certain

related parties upon the closing of the LBO Transaction:



138.    This ownership structure was such that moving up the chain of entities from the Debtor, each parent entity is the sole owner of the subsidiary, all the way up to New Water, which is the sole member of NWCWHC.

139.    The post-LBO Worth Entities were thus dominated by New Water.

140.    The Debtor Affiliates exercised complete control and domination over the Debtor such that they have no legal existence separate and distinct from the Debtor, and the Worth Entities functioned as one unified enterprise.

141.    Officers of the Worth Entities were unable to make independent decisions and take independent action without the approval of New Water.

142.    Several of the Worth Entities also shared the same address, whether directly or through their sole members.

143.    New Water, NWCWHC, WIH, and Worth Intermediate all stated their address as New Water's address, 2434 N. Federal Highway, Suite 418, Boca Raton, FL 33431, on various corporate documents or other agreements, including, but not limited to:

a.  The Limited Liability Company Agreement for NWC Worth Collection Holdings, LLC dated September 8, 2016;

b.  The Securityholders Agreement between WIH and NWCWCH dated September 29, 2016;

c.  The Consulting Agreement between Worth Intermediate and New Water, dated September 29, 2016.

144.    Following the LBO Transaction, the Worth Entities had numerous overlapping officers and directors.

145.    These included, without limitation, Susan Gustafson as Chief Executive Officer of the Debtor and Worth Intermediate; Art Lorenz as Chief Financial Officer of the Debtor, Worth Intermediate, and WIH; and Josephine Amistoso as Controller of the Debtor and Worth Intermediate.

146.    New Water also installed its own Partners across all of the Worth Entities as officers and directors, with a significant amount of overlap.

147.    For example, McGee was at various times President of WIH, Worth Intermediate, and NWCWCH, an Investor Manager of WIH. In addition to McGee, Neimark and Disa were at various times Investor Managers of WIH and Vice Presidents of NWCWCH. Neimark was also at one time the President of WIH.

148.    Whether or not McGee, Disa, and Neimark were installed in a formal position within each Worth Entity, directors and officers of each of the Worth Entities reported to them.

149.    The New Water Partners were directly involved in and controlled the Debtor's day-to-day operations, including financing, budgeting, strategy, and operations.

150.    As a result of his overlapping roles, there are many instances in which McGee signed documents on both sides of transactions involving the Worth Entities, including the following:

    a.    September 29, 2016 Subscription Agreement between NWCWCH and New Water.

    b.    September 29, 2016 Subscription Agreement between WIH and NWCWCH.

    c.    September 29, 2016 Subscription Agreement between Worth Intermediate and WIH.

151.   These agreements were not the product of third-party, arm's-length negotiations between both parties.

152.   When McGee signed on each side of the agreement, he did not independently assess the value of the transactions in his leadership role for each Worth Entity.

153.   Even in cases in which the Debtor's officers were not directly employed by New Water, other officers of the Worth Entities, including Chief Financial Officer Art Lorenz and Controller Josephine Amistoso, also repeatedly signed on behalf of multiple Worth Entities on the same agreement.

### *Immediate Impact of the LBO Transaction on the Debtor*

154.   As detailed above, pursuant to the LBO Transaction, over thirty-nine million dollars ($39,000,000) was ultimately transferred to the Former Equity Holders and indirect equity holders of the Debtor by certain of the Debtor's directors and officers.

155.   The LBO Transaction significantly increased the Debtor's debt.

156.   The LBO Transaction was made with actual intent to hinder, delay, or defraud certain creditors of the Debtor.

157.   The Debtor was insolvent upon the closing of the LBO Transaction or became insolvent as a result of the LBO Transaction.

158.   The LBO Transaction caused the Debtor to engage in a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the transaction.

159.   By virtue of the LBO Transaction, the Debtor intended to incur, or believed or reasonably should have believed that the Debtor would incur, debts beyond the Debtor's ability to pay as they became due.

160.   The Debtor did not receive reasonably equivalent value for the LBO Transaction.

161.    CMPV and/or Catterton, either directly or indirectly, received over $31 million dollars in proceeds from Acquisition in connection with the LBO Transaction.

### *Financing Events Subsequent to the LBO Transaction*

162.    Immediately following the LBO Transaction, the Debtor and Debtor Affiliates encountered significant and ultimately catastrophic financial difficulties.

163.    After the closing of the LBO Transaction, the Debtor did not generate enough funds to service the LBO Obligations while also fulfilling the Debtor's other financial obligations.

164.    Within approximately a year after entering into the Monroe Credit Agreement, numerous events of default by the Borrowers existed under the Monroe Credit Agreement.

165.    Within approximately a year after entering into the Monroe Credit Agreement, the Borrowers informed Monroe that the Borrowers were unlikely to comply with the financial covenants set forth in Sections 5.2(a) and 5.2(b) of the Monroe Credit Agreement.

166.    Within approximately a year after entering into the Monroe Credit Agreement, the Borrowers informed Monroe that (i) the Borrowers failed to maintain a Fixed Charge Coverage Ratio of not less than 1.10 to 1.00 in violation of Section 5.2(a) of the Monroe Credit Agreement (ii) the Borrowers have failed to maintain a Total Debt to EBITDA Ratio of no more than 4.00 to 1.00, and (iii) the Borrowers failed to comply with certain other provisions of the Monroe Credit Agreement, all of which resulted in events of default under the Monroe Credit Agreement.

167.    The Monroe Loan was subsequently amended four (4) times between November 2017 and December 2018 to, among other things, waive numerous events of default.

### a.    *The MidCap Loan*

168.    In the period from the closing of the LBO Transaction through June 25, 2019, the Debtor continued to amass operating losses.

169. On or about June 25, 2019 (the "*MidCap Closing Date*"), the Debtor and Worth Intermediate borrowed additional capital from MidCap Financial Trust (the "*MidCap Loan*"), as administrative agent ("*MidCap*") for certain lenders under that certain Credit and Security Agreement dated as of June 25, 2019 by and among Worth Collection Intermediate Holdings, LLC and Certain of its Subsidiaries, each as Borrower, and collectively as Borrowers, and MidCap Financial Trust, as Administrative Agent and Lender (the "*MidCap Credit and Security Agreement*").

170. At the time of the MidCap Credit and Security Agreement, the Debtor's Chief Executive Officer was Susan Gustafson, and the Debtor's Chief Financial Officer was Art Lorenz.

171. Among other uses, the MidCap Loan satisfied the Debtor's obligations to First Niagara.

172. MidCap bailiwick is to provide loans to borrowers who are greater credit risks than borrowers of First Niagara.

173. Because MidCap provides loans to borrowers who are greater credit risks than borrowers of First Niagara, MidCap charges higher rates on its loans than First Niagara charges on similar types of loans.

174. Under the MidCap Credit and Security Agreement, the Debtor's and Worth Intermediate's obligations to MidCap were secured by a first-priority security interest in the working capital assets of the Debtor and by a second-priority security interest in the intellectual property assets of the Debtor.

175. All of the collateral used to secure the MidCap Loan was owned by the Debtor.

176.     Despite being a borrower obligated under the MidCap Loan, none of the deposit accounts, securities accounts, or other collateral listed on the MidCap Credit and Security Agreement were property of Worth Intermediate.

177.     Upon information and belief, Worth Intermediate does not own any real or personal property but was formed solely to consummated the LBO Transaction.

178.     Schedule 5.8 of the MidCap Credit and Security Agreement specifically lists WIH, NWCWCH, and New Water as "Affiliates" of the Debtor and Worth Intermediate.

179.     However, WIH, NWCWCH, and NWC are not listed as parties to the MidCap Credit and Security Agreement.

180.     Upon information and belief, WIH, NWCWCH, and New Water were parties to the MidCap Credit and Security Agreement because New Water sought to limit liability to the subsidiary entities, while insulating the parent entities, including WIH, NWCWCH, and New Water.

   b.  *MCA*

181.     Subsequent to the MidCap Closing Date, MidCap engaged the services of MCA Financial Group ("*MCA*"), an advisory firm, with regard to the Debtor.

182.     Within six (6) months of the MidCap Closing Date, MCA had prepared a plan to winddown and liquidate the Debtor's business, and such plan was actually implemented commencing in December 2019.

183.     This winddown was largely directed by the New Water Partners, who were assisted by the Debtor's President at that time in 2020, Kelly Collins, and the Debtor's Controller, Josephine Amistoso.

***The Debtor's Financial Condition was Destroyed by the LBO Transaction***

184.    Prior to the LBO Transaction, the Debtor had total indebtedness in the amount of $2,373,966.22.

185.    In the year ending on December 31, 2014, the Debtor incurred $77,000 in interest and financing related expenses and had net sales of $76,581,000 and a positive net income of $1,686,000.

186.    In the year ending on December 31, 2015, the Debtor incurred $23,000 in interest and financing related expenses and had net sales of $78,507,000 and a positive net income of $1,398,000.

187.    Upon the closing of the LBO Transaction, the Debtor was obligated for over $25,000,000 in debt.

188.    Upon the closing of the LBO Transaction, the Debtor only had $1,058,178.72 in funds in depository accounts.

189.    The staggering debt resulting from the LBO Transaction caused the Debtor's interest and financing related expenses to skyrocket to $1,760,000 in 2016 — an over five thousand percent (5,000%) increase from the prior year, despite the closing of the LBO Transaction occurring after approximately nine of the twelve months in that calendar year.

190.    The Debtor operated at a net loss of $1,610,000 in 2016.

191.    In 2017, the Debtor's interest and financing related expenses increased to $2,483,000.

192.    The Debtor operated at a net loss of $9,317,000 in 2017, the first full calendar year after the LBO Transaction.

193.    The Debtor had approximately $12 million in cash and cash equivalents at the end of 2014.

194.    The Debtor had almost $5 million in cash and cash equivalents at the end of 2015.

195.    The Debtor's cash dwindled to $445,000 in cash and cash equivalents at the end of 2016.

196.    The Debtor's cash position at the end of 2017 was lower than its cash position at the end of 2016.

197.    The Debtor's cash position at the end of 2018 was lower than its cash position at the end of 2017.

198.    The LBO Transaction amounted to a windfall payout to the Debtor's Former Equity Holders, with the Debtor picking up the tab in the form of $25 million in debt and leaving the Debtor's creditors at risk, maintaining a bleak amount of operating cash in relation to its significant post-LBO Transaction debt obligations, and pledging all of its assets as security for the newly-incurred debt.

199.    Notwithstanding the Debtor's dire financial condition following the LBO Transaction, New Water continued to drain the insolvent Debtor of resources through the Consulting Fees and New Water Transfers.

***The LBO Transaction and Transfer of over $39 Million to the Initial Transferees and Subsequent Transferees was Rife with Fraud***

200.    Via the LBO Transaction, the Debtor granted blanket security interests in all of its assets and incurred over $25 million in new debt without the Debtor receiving anything close to reasonably equivalent value in return.

201.    The principal beneficiaries of the LBO Transaction were the Former Equity Holders, who received, in total, approximately $39 million in connection with the leveraged acquisition by NWC.

202.    Of the $45,279,000 of Closing Distributions, after $2,373,966.22 was used to pay off certain indebtedness, the Debtor was left with a paltry $1,058,178.92 of cash to sustain all of its operating expenses and massive debt service on a going-forward basis.

203.    The Defendants were aware of the Debtor's financial condition prior to the LBO Transaction and understood that saddling the Debtor with over $25,000,000 in debt, upon the closing of the acquisition of the Debtor by NWC, would render the Debtor insolvent.

204.    The Defendants' intent in pursuing and closing the LBO Transaction can be inferred from various badges of fraud, including, without limitation:

a.    As part of the LBO Transaction, the Debtor granted blanket security interests to Monroe and First Niagara and left the Debtor with over $25 million in debt, while the only cognizable benefits that the Debtor received in exchange were (i) satisfaction of $2,373,966.22 of prior debt and (ii) a cash infusion of $1,058,178.92.

b.    As part of the LBO Transaction, the Former Equity Holders knowingly authorized, approved, and directed the Debtor to enter into a transaction that was so "one-sided" such that fraudulent intent may be inferred.

c.    The transfers were made to insiders – *i.e.*, the Former Equity Holders – who were the controlling shareholders, officers, and directors of the Debtor.

d.    The Debtor was rendered insolvent by the LBO Transaction.

e.    The Debtor was aware that it would not have enough funds to sustain its operating expenses and service its debt subsequent to the LBO Transaction.

f.    Rothschild's growth projections for the Debtor were fanciful and unrealistic.

g.    The Debtor, Catterton, CMPV, and Rothschild nonetheless sold these fanciful growth projections to prospective buyers.

h.    The Debtor was aware that the New Water offer was substantially higher than the next highest bid obtained by Rothschild for the Debtor's business.

i. The Debtor was aware that the cost of the Stock Transfer was substantially higher than the next highest bid obtained by Rothschild for the Debtor's business.

j. The Debtor was aware that the New Water offer required substantially more borrowing than the next highest bid obtained by Rothschild for the Debtor's business.

k. The Debtor was aware that the Stock Transfer required substantially more borrowing than the next highest bid obtained by Rothschild for the Debtor's business.

l. The Debtor was aware that the New Water offer was based on a valuation of the Debtor's business at a higher multiple of EBITDA than the next highest bid obtained by Rothschild for the Debtor's business.

m. The Debtor was aware that the cost of the Stock Transfer was based on a valuation of the Debtor's business at a higher multiple of EBITDA than the next highest bid obtained by Rothschild for the Debtor's business.

n. The Debtor was aware that the New Water Offer was based on a higher assessment of the Debtor's adjusted EBITDA than the next highest bid obtained by Rothschild for the Debtor's business.

o. The Debtor was aware that the cost of the Stock Transfer was based on a higher assessment of the Debtor's adjusted EBITDA than the next highest bid obtained by Rothschild for the Debtor's business.

p. The Debtor was aware that Rothschild's "final bid summary" outlining the two potential offers to purchase the Debtor did not indicate that the Hypatia Offer was based on post-closing projections, whereas the same "final bid summary" did indicate that the New Water Offer was based on post-closing projections.

q. The Debtor was aware that Rothschild's "final bid summary" outlining the two potential offers to purchase the Debtor did not indicate that the Hypatia Offer was based on post-closing projections, whereas the cost of the Stock Transfer was based on post-closing projections.

205. The Debtor was further looted immediately following the LBO Transaction:

a. New Water created the Debtor Affiliates for the purpose of holding its ownership interests of and controlling the Debtor in a manner that shielded New Water from liability.

b. New Water charged exorbitant Consulting Fees to siphon the Debtor's limited cash in exchange for less than reasonably equivalent value.

c.  New Water directed the Worth Entities' winddown, knowing that the Debtor was insolvent and could not fully repay certain creditors, while continuing to assert that it was owed the Consulting Fees.

**The Worth Entities were Inextricably Intertwined, Insufficiently Capitalized, and Treated as a Single Entity by Creditors**

206.    In addition to leadership overlap and "sweetheart" transactions (*i.e.*, more favorable to the counterparty than a market transaction) among the Worth Entities, the post-LBO Worth Entities' operations and finances were inextricably intertwined, including, without limitation, as follows:

a.  Insurance Payments: the Debtor was paying insurance premium financing payments to provide insurance coverage to other Worth Entities. The Debtor was directly paying for an insurance financing agreement with IPFS of New York LLC, for insurance policies that insured WIH.

b.  Credit Agreements: Worth Intermediate and the Debtor are co-borrowers under the same line of credit under the First Niagara Credit Agreement, the Monroe Credit Agreement and the MidCap Credit and Security Agreement.

207.    The Debtor Affiliates (Worth Intermediate, WIH, and NWCWCH), were not independently functioning businesses.

208.    For example, on the MidCap Credit and Security Agreement, Worth Intermediate and its subsidiaries (*i.e.,* the Debtor) are listed as Borrowers and Credit Parties.

209.    On Schedule 9.1 of the agreement, the collateral to the agreement is listed as "all of each Credit Party's assets." However, on Schedule 9.2, a listing of the Location of Collateral lists only collateral owned by the Debtor, and lists no collateral owned by Worth Intermediate.

210.    Upon information and belief, this is because Worth Intermediate, and similarly, the other Debtor Affiliates, were undercapitalized and owned little or no property.

211.    Schedule 5.14 of the MidCap Credit and Security Agreement included a listing of the location of the deposit accounts and securities accounts owned by the Debtor and Worth Intermediate.

212.    However, no deposit or securities accounts were owned in the name of Worth Intermediate.

213.    Upon information and belief, this is because Worth Intermediate, and other Debtor Affiliates, held no deposit or securities accounts.

214.    On that certain Forbearance Agreement dated as of January 6, 2020 between Worth Intermediate and the Debtor as Borrowers and MidCap Funding IV Trust as Agent (the "*MidCap Forbearance Agreement*"), the Debtor and Worth Intermediate were covered parties. However, there is only one Budget attached as an exhibit for both entities.

215.    Upon information and belief, this budget is for the Debtor, not Worth Intermediate.

216.    Upon information and belief, there is only one budget attached because Worth Intermediate, and other Debtor Affiliates, did not regularly prepare, maintain, and promulgate budgets.

217.    Upon information and belief, the Debtor Affiliates incurred few or no payment obligations because they were not actively engaged in any business.

218.    Upon information and belief, to the extent that payments were made by Worth Entities for ordinary course obligations incurred by other Worth Entities, these payments were made by the Debtor.

219.    Upon information and belief, to the extent that payments were not made by Worth Entities for ordinary course obligations incurred by other Worth Entities, it is because the other Worth Entities were incurring few ordinary course obligations.

220.    The Debtor's creditors treated the Worth Entities as a unified entity.

221.     In fact, the Worth Entities' own *officers* appear to have had a poor understanding of the Worth Entities' complex, non-unified structure, and treated the Worth Entities as a single entity.

222.     For example, WIH held a 2016 insurance policy with Navigators Insurance Company ("*Navigators*"). The application for the policy is attached to the policy. The application is dated November 4, 2016 (over a month after the LBO), and the applicant listed is Holdings.

223.     However, at the time of the application, Holdings did not hold any interest in the Debtor. Therefore, the applicant had filled out the application for the incorrect entity. Upon information and belief, this application was filled out and signed by DeFeo, the Debtor's Chief Executive Officer.

224.     An attachment to another 2017 Navigators policy held by WIH, a New York state regulation form, is signed on behalf of the Debtor as the "Insured Company" rather than WIH, despite the policy being held in WIH's name. Upon information and belief, this form was signed by Grossman as Chief Operating Officer and Chief Financial Officer of the Debtor.

225.     Furthermore, both the 2016 and 2017 WIH Navigators policies had attachments discussing the Debtor's wage and hour guidelines, signed by Grossman as "COO/CFO," even though the named insured under the policy is WIH, not the Debtor.

226.     The Debtor's officers, who were also officers or otherwise controlled the Debtor Affiliates, treated the Debtor and the Debtor Affiliates as a single, integrated entity.

### *Notice to Defendants Regarding Amendment to Complaint*

227.     It is the Trustee's intention to avoid, recover, or pursue all transfers or amounts that the Trustee is entitled to under applicable law and where the Trustee determines that pursuing such action is in the best interest of the Debtor's bankruptcy estate.  Accordingly, the Trustee hereby provides notice that he reserves the right to amend this Complaint to include, without limitation:

(i) additional transfers, (ii) modifications of and/or revisions to the Defendant's name, (iii) additional defendants, and/or (v) additional causes of action (collectively, the "*Amendments*") that may become known to the Trustee at any time during this adversary proceeding, through formal discovery or otherwise, and for the Amendments to relate back to this Complaint.

## CLAIMS FOR RELIEF

### COUNT I

### (Substantive Consolidation)

228.    The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

229.    With respect to a request to substantively consolidate the debtor with non-debtor parties, the Third Circuit has stated as follows:

> A proponent of substantive consolidation must demonstrate one of two rationales for its application, either that (i) prepetition, the entities for whom substantive consolidation is sought] disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity; or (ii) postpetition, their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors.

*In re Lisanti Foods Inc.*, 241 Fed. Appx. 1, 2 (3d Cir. 2007) (referencing *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005).

230.    The Debtor Affiliates were created through the cooperation of Catterton, CMPV, Rothschild, New Water, and the Debtor, among others, by and to effectuate the LBO Transaction.

231.    The Worth Entities are inextricably intertwined both operationally and financially. By way of example, and in addition to all of the allegations pleaded throughout this Complaint (and without excluding additional evidence the Trustee learns through discovery), the Worth Entities were intertwined in the following ways:

> a.    Each parent Worth Entity is the sole owner of the subsidiary Worth Entity.

b. The Worth Entities regularly were co-borrowers on loans, including the Niagara Loan, Monroe Loan, and MidCap Loan, without any clear delineation of which Worth Entity was obligated to repay the loan obligations.

c. There was substantial overlap in officers and directors of the Worth Entities, including McGee, Neimark, Disa, who were employed by New Water.

d. Other officers who were not directly employed by New Water also had overlapping roles for the Worth Entities, including, without limitation, Susan Gustafson as Chief Executive Officer of the Debtor and Worth Intermediate, Art Lorenz as Chief Financial Officer of the Debtor, Worth Intermediate, and WIH, and Josephine Amistoso as Controller of the Debtor and Worth Intermediate.

e. McGee routinely signed for both parties to various transactions involving any of the Worth Entities and New Water.

f. Officers for the Worth Entities, including Art Lorenz and Josephine Amistoso, also frequently signed on behalf of multiple Worth Entities on the same agreements.

g. The Debtor made insurance financing payments for policies which insured other Worth Entities.

h. The Worth Entities pledged collateral to secure loans that obligated other Worth Entities.

i. Several of the Worth Entities all had the same address — New Water's address.

j. The Debtor Affiliates existed for the primary purpose of owning other of the Worth Entities.

k. In documents which obligated multiple of the Worth Entities, the Worth Entities regularly provided only a single budget, rather than multiple budgets for each entity.

l. The Worth Entities were treated as one unified entity by creditors:

m. The First Niagara Credit Agreement treated the Debtor and Worth Intermediate as co-borrowers but required no distinct obligations from either party.

n. The Monroe Credit Agreement treated the Debtor and Worth Intermediate as co-borrowers but required no distinct obligations from either party.

o. The MidCap Credit and Security Agreement treated the Debtor and Worth Intermediate as co-borrowers but required no distinct obligations from either party.

p.  The Notices of Default under the MidCap Credit and Security Agreement treated the Debtor and Worth Intermediate as defaulting parties on the same loan.

q.  The Debtor paid for an insurance financing agreement which insured WIH.

r.  Upon information and belief, to the limited extent that the Debtor Affiliates did incur obligations, these obligations were paid by the Debtor.

232.  As the Debtor was the only of the Worth Entities that was an operating business, the Debtor Affiliates served no purpose other than to attempt to shield assets from creditors.

233.  The Worth Entities shuffled assets between each other with the goal of shielding such assets from creditors and insulating liability. For example, the Worth Entities entered into the Subscription Agreements, signed by McGee for all parties, which transferred $20 million between the Worth Entities and New Water.

234.  The Worth Entities constitute a single unified entity.

235.  To treat the Worth Entities as separate entities would severely prejudice the Debtor's creditors, as it would shield certain of the Worth Entities from liability on certain causes of action, including, without limitation, transfers that would otherwise be avoidable if the Worth Entities were consolidated.

236.  The time and expense necessary to attempt to unscramble the entanglement of the Debtor's affairs with that of the other Worth Entities is so substantial that no accurate identification and allocation of assets is possible in the absence of substantive consolidation.

237.  No harm will come to the Worth Entities should this Court enter an order of substantive consolidation because these entities are already so entirely entangled.

238.  The Worth Entities have already effectively ceased operations.

239.    Substantive consolidation will allow a truly equitable distribution of assets among the Debtor's creditors by treating the Debtor and the other Worth Entities as a single economic unit.

240.    If the Worth Entities are not substantively consolidated, the Defendants may receive a windfall at the expense of creditors of the Debtor.

241.    There is substantial precedent for a bankruptcy court to grant non-debtor substantive consolidation on a *nunc pro tunc* basis.  *See, e.g.*, *In re DBSI Inc.*, Case No. 08-12687 (PJW), Findings of Fact, Conclusions of Law and Order Confirming Second Amended Joint Chapter 11 Plan of Liquidation [Docket No. 5924], at ¶ J.

**WHEREFORE**, the Trustee respectfully seeks entry of an order of this Court ordering substantive consolidation, *nunc pro tunc*, of the Debtor's estate with the Worth Entities, effective as of the Petition Date.

## COUNT II

### (Declaratory Relief: Piercing the Corporate Veil)

242.    The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

243.    With the assistance of high-level management personnel of the Debtor and the Defendants and other parties, the other Worth Entities exercised such a high degree of domination and control over the Debtor, such that the Worth Entities have no separate existence but rather operate as a single entity and enterprise.

244.    In addition to all of the allegations pleaded throughout this Complaint (and without excluding additional evidence the Trustee learns through discovery), there are numerous examples of this domination and control:

      a.    There is a unity of interest and ownership between the Worth Entities such that the separateness of the corporations and the owners no longer exist. Each Worth Entity is the sole owner of its subsidiary Worth Entity. This unity of ownership

extends from the Debtor, through each of the Debtor Affiliates, up to New Water.

b. New Water had a Consulting Agreement with Worth Intermediate, the sole owner of the Debtor, in which Worth Intermediate incurred exorbitant obligations owed to New Water for less than reasonably equivalent value.

c. McGee, Neimark, and Disa — Partners of New Water — held positions as officers and directors of multiple Worth Entities.

d. The Debtor's other officers reported directly to McGee, Disa, and Neimark — both officers of the Worth Entities and Partners at New Water — as their superiors and were unable to take actions without their consent.

e. McGee routinely signed for both parties to transactions between Worth Entities.

f. Several of the Worth Entities also shared the same address. New Water and WIH all share the same address on various corporate documents — New Water's address. Furthermore, the address lines of the Worth Entities were frequently addressed "in care of" New Water, and to the attention of New Water employees, included McGee.

g. New Water Partners, including McGee, Disa, and Neimark, were directly involved in and directed the day-to-day operations of the Worth Entities.

h. New Water Partners, including McGee, Disa, and Neimark, were directly involved in and directed the Debtor's winddown.

i. New Water Partners, including McGee, Disa and Neimark, set corporate strategy for the Debtor and made important corporate decisions.

245.    The Debtor Affiliates are mere instrumentalities, agents, and/or alter egos of the Debtor that have no legal existence or purpose separate and distinct from the Debtor.

246.    The Worth Entities ignored corporate formalities. In addition to all of the allegations pleaded throughout this Complaint (and without excluding additional evidence the Trustee learns through discovery), and as examples:

a. The Worth Entities regularly signed loan transactions which inequitably obligated one Worth Entity (the Debtor) more than others.

b. Multiple of the Worth Entities had (at various times) the same address — New Water's address.

    c.   The Worth Entities shared a significant number of the same personnel at various times: notably DeFeo, Rosenberg, Grossman, McGee, Disa, Neimark, Art Lorenz, and Josephine Amistoso, among others.

    d.   Officers of the Worth Entities regularly signed agreements between the Worth Entities and/or New Water on both sides of the transaction.

    e.   Officers of the Worth Entities sought insurance policies in the name of WIH, but submitted incorrect entity names and information, or information referring to the Debtor rather than WIH.

    f.   Upon information and belief, the Debtor Affiliates did not control significant assets, apart from their ownership interests in subsidiary entities, which could be used as collateral.

    g.   Upon information and belief, the Debtor Affiliates did not maintain depository accounts.

    h.   Upon information and belief, the Debtor Affiliates did not maintain securities accounts.

    i.   Upon information and belief, the Debtor Affiliates did not regularly prepare budgets or other accounting documents.

247. Further, the Debtor was left severely undercapitalized relative to the Debtor's undertakings, including, but not limited to, entering into the SPA.

248. The LBO Transaction used the Worth Entities as a vehicle to funnel the Debtor's funds from the LBO Transaction to Catterton, CMPV, and New Water, and left the Debtor with insufficient operating cash and over $25 million in debt.

249. The $25 million debt burden that the Debtor incurred through the LBO Transaction left the Debtor, and the other Worth Entities, insolvent, as evidenced by (in addition to the allegations pleaded throughout this Complaint and without excluding additional evidence the Trustee learns through discovery):

    a.   The Debtor's inadequate cash position after the LBO Transaction.

    b.   The Debtor's secured debt load relative to its revenue and profits.

    c.   The Debtor's and Worth Intermediate's need to enter into the Niagara Loan and Monroe Loan to generate enough cash to continue operations.

    d.   The Debtor's and Worth Intermediate's need to obtain the MidCap Loan, a high-risk loan, to pay off prior loans.

    e.   The numerous events of default under the MidCap Loan.

    f.   The Debtor's inability to pay unsecured creditors.

250.    To treat the other Worth Entities as separate entities from the Debtor would severely prejudice the Debtor's creditors, as it would shield the Defendants from liability on certain causes of action, including, without limitation, transfers that would otherwise be avoidable if the Worth Entities were consolidated.

251.    Under these circumstances, it would be unfair and inequitable to treat the other Worth Entities as separate entities from the Debtor.

252.    To adhere to the doctrine of the corporate entity would promise injustice and/or protect fraud.

**WHEREFORE**, the Trustee respectfully seeks entry of an order declaring that the other Worth Entities are mere instrumentalities, agents, and/or alter egos of the Debtor and that the Worth Entities are a single legal entity.

## COUNT III

### (Declaratory Relief – Collapsing of Transactions Associated with the LBO Transaction)

253.    The Trustee incorporates all preceding paragraphs as if fully set forth herein.

254.    As stated by this Court in *Official Committee of Unsecured Creditors v. The CIT Group/Business Credit, Inc.* (*In re Jevic Holding Corp.*), "[t]he Third Circuit has recognized the propriety of collapsing multiple transactions and treating them as one integrated transaction for the purpose of assessing a defendant's fraudulent transfer liability." 2011 WL 4345204, at *4 (Bankr. D. Del. Sept. 15, 2011) (Shannon, J.) (cleaned up); *see also In re Sunbeam Corp.*, 284 B.R. 355, 370 (Bankr. S.D.N.Y.2002) ("The collapsing concept is usually applied when a series of

transactions actually comprise a single integrated transaction, notwithstanding the fact that the 'formal structure erected and labels attached' make them appear distinct.").

255.     An LBO is the classic context in which courts have collapsed multiple transactions for the purpose of assessing and finding fraudulent transfer liability. "This [collapsing] approach finds its most frequent application to lenders who have financed leveraged buyouts of companies that subsequently become insolvent." *Mervyn's LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings, LLC)*, 426 B.R. 488, 498 (Bankr. D. Del. 2010).

256.     To determine whether a series of transactions should be "collapsed" and viewed as a single integrated transaction, courts focus on the substance rather than on the form of the transactions and consider the overall intent and impact of the transactions. *See In re Jevic Holding Corp.*, 2011 WL 4345204, at *4.

257.     The Delaware Bankruptcy Courts have considered the following factors when assessing whether the parties to the transactions sought to be collapsed had the requisite knowledge and intent to warrant consideration of the asserted transactions in the aggregate: whether all parties involved in the individual transactions had knowledge of the other transactions; whether each transaction sought to be collapsed would have occurred on its own; and whether each transaction was dependent or conditioned on the other transactions. *Id.*

258.     Each of the transactions that comprise the LBO Transaction were dependent or conditioned upon one another.

259.     These transactions were executed by all of the same parties: namely the Debtor, Catterton, CMPV, Rothschild, New Water, Monroe and the Debtor Affiliates (among others).

260.     The transactions were executed by same group of individuals, many of whom had overlapping roles with multiple entities.

261.    The transactions were executed on the same day — the LBO Transaction Date, September 29, 2016.

262.    The parties to the Monroe Credit Agreement and the LBO Transaction had knowledge of such other transaction.

263.    The parties to the Monroe Credit Agreement and the Stock Transfer had knowledge of such other transaction.

264.    The parties to the Monroe Credit Agreement and the Consulting Agreement had knowledge of such other transaction.

265.    The parties to the Monroe Credit Agreement and the Rothschild Distribution had knowledge of such other transaction.

266.    The parties to the Monroe Credit Agreement and the Equity Distributions had knowledge of such other transaction.

267.    The parties to the Monroe Credit Agreement and the Closing Distributions had knowledge of such other transaction.

268.    The Monroe Loan and the LBO Transaction would not have occurred alone.

269.    The Monroe Loan and the Stock Transfer would not have occurred alone.

270.    The Monroe Loan and the Rothschild Distribution would not have occurred alone.

271.    The Monroe Loan and the Equity Distributions would not have occurred alone.

272.    The Monroe Loan and the Closing Distributions would not have occurred alone.

273.    The Monroe Loan and the other transactions that comprise the LBO Transaction but are not already specifically delineated herein, including, without limitation, the Subscription Agreements, Securityholder Agreements, and other agreements and corporate formation documents underlying the LBO Transaction, would not have occurred alone.

274.    The Monroe Loan and the LBO Transaction are appropriately "collapsed" with each other so as to view them as one singly integrated transaction.

275.    The Monroe Loan and the Stock Transfer are appropriately "collapsed" with each other so as to view them as one singly integrated transaction.

276.    The Monroe Loan and the Rothschild Distribution are appropriately "collapsed" with each other so as to view them as one singly integrated transaction.

277.    The Monroe Loan and the Equity Distributions are appropriately "collapsed" with each other so as to view them as one singly integrated transaction.

278.    The Monroe Loan and the Closing Distributions are appropriately "collapsed" with each other so as to view them as one singly integrated transaction.

279.    The Monroe Loan and the other transactions that comprise the LBO Transaction but are not already specifically delineated herein, including, without limitation, the Subscription Agreements, Securityholder Agreements, and other agreements and corporate formation documents underlying the LBO Transaction, are appropriately "collapsed" with each other so as to view them as one singly integrated transaction.

280.    The examples set forth herein are illustrative of the factors supporting the collapsing of transactions associated with the LBO Transaction, but such examples are not intended to limit such grounds to the other allegations set forth throughout this Complaint (or additional evidence the Trustee learns through discovery).

**WHEREFORE**, the Trustee respectfully requests that this Court (a) collapse the Monroe Loan and the LBO Transaction with each other so as to view them as one single integrated transaction; (b) collapse the Monroe Loan and the Stock Transfer with each other so as to view them as one single integrated transaction; (c) collapse the Monroe Loan and the Rothschild

Distribution with each other so as to view them as one single integrated transaction; (d) collapse the Monroe Loan and the Equity Distributions with each other so as to view them as one single integrated transaction; (e) collapse the Monroe Loan and the Closing Distributions with each other so as to view them as one single integrated transaction; (f) collapse the Monroe Loan and the other transactions related to the LBO Transaction to the extent not already named herein; and (g) for such other relief as the Court deems just and proper.

## COUNT IV

### (Avoidance of D&O Distributions Under 11 U.S.C. § 547)

281.     The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

282.     The D&O Distributions were made to the D&Os by the Worth Entities.

283.     The D&O Distributions were made from one or more of the Worth Entities' accounts and constituted transfers of an interest in property of the Worth Entities.

284.     During the Preference Period, the D&Os were claimants of the Worth Entities at the time of each D&O Distributions by virtue of being an officer and/or director of the Worth Entities.

285.     Each D&O Distribution was to or for the benefit of a creditor within the meaning of section 547(b)(1) of the Bankruptcy Code because each D&O Distribution either reduced or fully satisfied a claim of the D&Os against the Worth Entities.

286.     Each D&O Distribution was made for, or on account of, an antecedent claim of each D&O before such D&O Distribution was made.

287.     Each D&O Distribution was made while the Worth Entities were insolvent.  The Trustee is entitled to the presumption of insolvency for each D&O Distribution made during the Preference Period pursuant to section 547(f) of the Bankruptcy Code.

288.     Each D&O Distribution was made during the Preference Period.

289. As a result of each D&O Distribution, the D&Os received more than they would have received if (i) the D&O Distribution had not been made; and (iii) the D&Os received payment on account of their claims under the provisions of the Bankruptcy Code.

290. Accordingly, the Trustee is entitled to an order and judgment against the D&Os avoiding each D&O Distribution made during the Preference Period pursuant to section 547(b) of the Bankruptcy Code.

**WHEREFORE**, the Trustee requests that the Court enter an order and judgment against the D&Os avoiding each D&O Distribution pursuant to section 547(b) of the Bankruptcy Code.

## COUNT V

**(Avoidance and Recovery of the D&O Distributions – Fraudulent Transfer Pursuant to 11 U.S.C. §§ 544 and 550, and 6 Del. C. § 1304)**

291. The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

292. Section 544 of the Bankruptcy Code provides as follows:

(a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—

1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;

2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists; or

3) a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

(b)(1)   Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502 (e) of this title.

(b)(2)   Paragraph (1) shall not apply to a transfer of a charitable contribution (as that term is defined in section 548(d)(3)) that is not covered under section 548(a)(1)(B), by reason of section 548(a)(2).  Any claim by any person to recover a transferred contribution described in the preceding sentence under Federal or State law in a Federal or State court shall be preempted by the commencement of the case.

11 U.S.C. § 544.

293.   Delaware Code Title 6, § 1304, titled "Transfers fraudulent as to present and future creditors," provides, in pertinent part, as follows:

(a)   A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1)   With actual intent to hinder, delay or defraud any creditor of the debtor; or

(2)   Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

a.   Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

b.   Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

6 Del. C. § 1304.

294.   The Worth Entities did not receive reasonably equivalent value in exchange for the D&O Distributions or the D&O Distributions were made with actual intent to hinder, delay or defraud any creditor of the Worth Entities.

295.   At the time of the D&O Distributions, the Worth Entities were engaged or was about to engage in a business or a transaction for which the remaining assets of the Worth Entities were unreasonably small in relation to the business or transaction.

**WHEREFORE**, the Trustee requests that the Court enter an order and judgment against the D&Os avoiding the D&O Distributions pursuant to 11 U.S.C. §§ 544, 550 and 6 Del. C. § 1304.

## COUNT VI

**(Avoidance and Recovery of the D&O Distributions – Fraudulent Transfer Pursuant to 11 U.S.C. §§ 544 and 550, and 6 Del. C. § 1305)**

296.   The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

297.   Delaware Code Title 6, § 1305, titled "Transfers fraudulent as to present creditors," provides, in pertinent part:

> (a)   A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.
>
> (b)   A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time and the insider had reasonable cause to believe that the debtor was insolvent.

6 Del. C. § 1305.

298.   The Worth Entities made the D&O Distributions without receiving a reasonably equivalent value in exchange for such transfer.

299.   The Worth Entities were insolvent or became insolvent as a result of the D&O Distributions.

**WHEREFORE**, the Trustee requests that the Court enter an order and judgment against the D&Os avoiding the D&O Distributions pursuant to 11 U.S.C. § 544 and 6 Del. C. § 1305.

## COUNT VII

### (Recovery of Avoided Fraudulent Transfers Under 6 Del C. § 1307)

300.    The Trustee repeats and realleges each of the allegations set forth in the paragraphs above as if fully set forth herein.

301.    Title 6 of the Delaware Code, § 1307, titled "Remedies of creditors," provides:

(a)    In an action for relief against a transfer or obligation under this chapter, a creditor, subject to the limitations in § 1308 of this title, may obtain:

(1)    Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim . . . .

6 Del. C. § 1307.

302.    To the extent that the transfer of the D&O Distributions are avoided under 6 Del. C. § 1304, *et seq.*, the Trustee may recover, for the benefit of the estate, the property transferred or the value of such property pursuant to 6 Del. C. § 1304, *et seq.*

303.    The transfer of the D&O Distributions should be avoided.

**WHEREFORE**, the Trustee requests that the Court enter an order allowing the Trustee to recover from the D&Os the D&O Distributions, plus interest thereon to the date of payment and the costs of this action, pursuant to 6 Del C. § 1307.

## COUNT VIII

### (Breach of Fiduciary Duty)

304.    The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

305.    At all relevant times, the D&Os were officers and/or directors of the Worth Entities. As officers and/or directors, the D&Os owed the Worth Entities fiduciary duties of care, good faith, loyalty, and fair dealing. As the Worth Entities were either rendered insolvent or placed in

the zone of insolvency as a result of the LBO Transaction, the D&Os owed fiduciary duties to all of the Worth Entities' stakeholders, including its creditors, who were harmed due to the Worth Entities' inability to pay them in full.

306.    The D&Os each breached their fiduciary duties to the Worth Entities and its creditors by causing or allowing the Worth Entities to engage in conduct that wrongfully manipulated corporate property to avoid paying creditor claims, and/or to benefit themselves at the expense of creditors. Such conduct includes, without limitation:

a.    Facilitating and/or approving paying of the Closing Fee while knowing the LBO Transaction would render the Worth Entities insolvent;

b.    Facilitating and/or approving payment of the Consulting Fees while knowing the Worth Entities were insolvent, facing considerate debt obligations, operating at a net loss, and had minimal cash reserves on hand;

c.    Facilitating and/or approving payment of the NWC Preference Transfers while knowing the Worth Entities were insolvent, facing considerate debt obligations, operating at a net loss, and had minimal cash reserves on hand;

d.    Facilitating, approving, and/or allowing the Wind-Down to incur which deepened the Worth Entities' insolvency at the detriment of the Worth Entities' creditors and other stakeholders;

e.    Facilitating, approving, and/or allowing the D&O Distributions at the time when the Worth Entities were insolvent;

f.    Facilitating, approving, and/or allowing the LBO Transaction.

g.    Approval of entry into Monroe Loan.

h.    Approval of entry into management agreement.

    i.       Approval of payments under management agreement.

    j.       Delegated their duties regarding the Debtor to MidCap or MCA.

    k.      Harming the Debtor's estate and creditors.

    l.     Allowing accounting irregularities.

307.    By reason of the foregoing actions, the D&Os, acting both individually and collectively, engaged in self-dealing, did not act in good faith, and breached their respective duties.

308.    The Worth Entities have been substantially damaged as a direct and proximate result of the breaches of fiduciary duties by the D&Os.

309.    Accordingly, the Trustee is entitled to judgment against the D&Os jointly and severally in an amount to be determined at trial.

**WHEREFORE**, the Trustee respectfully requests that the Court enter an order: (a) finding that the D&Os breached their fiduciary duties to the Worth Entities and, once Worth Entities were in the zone of insolvency and subsequently insolvent, to creditors; (b) entering judgment against the D&Os (jointly and severally) in the amount of the Worth Entities' liabilities, which amount will be determined at trial; (c) awarding the Trustee pre- and post-judgment interest, costs, and attorneys' fees to the fullest extent permitted by law; and (d) granting the Trustee all other relief the Court deems just and proper.

## COUNT IX

### (Avoidance of Preferential Transfers Under 11 U.S.C. § 547)

*(Against Collins)*

310.    The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

311.    Each of the Collins Transfers is a transfer made to Collins by the Debtor.

312.    The Debtor made the Collins Transfers to or for the benefit of Collins in an aggregate amount of not less than $73,540.29.

313.    The Collins Transfers were made from one or more of the Debtor's accounts or property and constituted transfers of an interest in property of the Debtor.

314.    At or around the time that Collins received the Collins Transfers, Collins was an "insider" of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.

315.    Each Collins Transfer was to or for the benefit of a creditor within the meaning of section 547(b)(1) of the Bankruptcy Code because each Collins Transfer either reduced or fully satisfied a debt or debts then owed by the Debtor to Collins.

316.    Each Collins Transfer was made for, or on account of, an antecedent debt or debts owed by the Debtor to Collins before the Collins Transfers were made, each of which constituted a "debt" or "claim" (as those terms are defined in the Bankruptcy Code) of Collins prior to being paid by the Debtor.

317.    Each Collins Transfer was made while the Debtor was insolvent.

318.    Pursuant to section 547(f) of the Bankruptcy Code, The Trustee is entitled to the presumption of insolvency for all Collins Transfers that were made during the ninety days before the Petition Date.

319.    Each Collins Transfer the Trustee seeks to avoid and recover pursuant to this Count of the Complaint was made during the Preference Period.

320.    As a result of each Collins Transfer, Collins received more than she would have received if (i) the Collins Transfers had not been made; and (iii) Collins received payment of her debts under the provisions of the Bankruptcy Code.

321.    Collins was the initial transferee of the Collins Transfers or the immediate or mediate transferee of such initial transferee or the person or entity for whose benefit the Collins Transfers were made.

322.    Pursuant to section 547(g) of the Bankruptcy Code, Collins bears the burden of proof of any defenses she may possess under section 547(c) of the Bankruptcy Code.

323.    The Trustee acknowledges that Collins has raised purported defenses under section 547(c) of the Bankruptcy Code and for which she bears the burden of proof under section 547(g) of the Bankruptcy Code.    However, the limited records provided to the Trustee upon his appointment, and the information received by the Trustee via formal or informal discovery, do not fully include adequate information to convince the Trustee of the validity of such defenses.

324.    Accordingly, the Trustee is entitled to an order and judgment against Collins avoiding each Transfer pursuant to section 547(b) of the Bankruptcy Code.

**WHEREFORE**, the Trustee requests that the Court enter an order and judgment against Collins avoiding each Collins Transfer pursuant to section 547(b) of the Bankruptcy Code, awarding interest thereon to the date of payment and the costs of this action to the Trustee, and for such other and further relief as the Trustee is entitled or the Court deems just.

## COUNT X

### (Avoidance of Preferential Transfers Under 11 U.S.C. § 547)

*(Against Gustafson)*

325.    The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

326.    Each of the Gustafson Transfers is a transfer made to Gustafson by the Debtor.

327.    The Debtor made the Gustafson Transfers to or for the benefit of Gustafson in an aggregate amount of not less than $72,232.67

328.    The Gustafson Transfers were made from one or more of the Debtor's accounts or property and constituted transfers of an interest in property of the Debtor.

329.    At or around the time that Gustafson received the Gustafson Transfers, Gustafson was an "insider" of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.

330.     Each Gustafson Transfer was made to or for the benefit of a creditor within the meaning of section 547(b)(1) of the Bankruptcy Code because each Gustafson Transfer either reduced or fully satisfied a debt or debts then owed by the Debtor to Gustafson.

331.     Each Gustafson Transfer was made for, or on account of, an antecedent debt or debts owed by the Debtor to Gustafson before the Gustafson Transfers were made, each of which constituted a "debt" or "claim" (as those terms are defined in the Bankruptcy Code) of Gustafson prior to being paid by the Debtor.

332.     Each Gustafson Transfer was made while the Debtor was insolvent.

333.     Pursuant to section 547(f) of the Bankruptcy Code, the Trustee is entitled to the presumption of insolvency for all Gustafson Transfers that were made during the ninety days before the Petition Date.

334.     Each Gustafson Transfer the Trustee seeks to avoid and recover pursuant to this Count of the Complaint was made during the Preference Period.

335.     As a result of each Gustafson Transfer, Gustafson received more than she would have received if (i) the Gustafson Transfers had not been made; and (iii) Gustafson received payment of her debts under the provisions of the Bankruptcy Code.

336.     Gustafson was the initial transferee of the Gustafson Transfers or the immediate or mediate transferee of such initial transferee or the person or entity for whose benefit the Gustafson Transfers were made.

337.     Pursuant to section 547(g) of the Bankruptcy Code, Gustafson bears the burden of proof of any defenses she may possess under section 547(c) of the Bankruptcy Code.

338.     Accordingly, the Trustee is entitled to an order and judgment against Gustafson avoiding each Gustafson Transfer pursuant to section 547(b) of the Bankruptcy Code.

**WHEREFORE**, the Trustee requests that the Court enter an order and judgment against Gustafson avoiding each Gustafson Transfer pursuant to section 547(b) of the Bankruptcy Code, awarding interest thereon to the date of payment and the costs of this action to the Trustee, and for such other and further relief as the Trustee is entitled or the Court deems just.

## COUNT XI

### (Avoidance of Preferential Transfers Under 11 U.S.C. § 547)

*(Against Amistoso)*

339.    The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

340.    Each of the Amistoso Transfers is a transfer made to Amistoso by the Debtor.

341.    The Debtor made the Amistoso Transfers to or for the benefit of Amistoso in an aggregate amount of not less than $160.00.

342.    The Amistoso Transfers were made from one or more of the Debtor's accounts or property and constituted transfers of an interest in property of the Debtor.

343.    At or around the time that Amistoso received the Amistoso Transfers, Amistoso was an "insider" of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.

344.    Each Amistoso Transfer was made to or for the benefit of a creditor within the meaning of section 547(b)(1) of the Bankruptcy Code because each Amistoso Transfer either reduced or fully satisfied a debt or debts then owed by the Debtor to Amistoso.

345.    Each Amistoso Transfer was made for, or on account of, an antecedent debt or debts owed by the Debtor to Amistoso before the Amistoso Transfers were made, each of which constituted a "debt" or "claim" (as those terms are defined in the Bankruptcy Code) of Amistoso prior to being paid by the Debtor.

346.    Each Amistoso Transfer was made while the Debtor was insolvent.

347.     Pursuant to section 547(f) of the Bankruptcy Code, the Trustee is entitled to the presumption of insolvency for all Amistoso Transfers that were made during the ninety days before the Petition Date.

348.     Each Amistoso Transfer the Trustee seeks to avoid and recover pursuant to this Count of the Complaint was made during the Preference Period.

349.     As a result of each Amistoso Transfer, Amistoso received more than she would have received if (i) the Amistoso Transfers had not been made; and (ii) Amistoso received payment of her debts under the provisions of the Bankruptcy Code.

350.     Amistoso was the initial transferee of the Amistoso Transfers or the immediate or mediate transferee of such initial transferee or the person or entity for whose benefit the Amistoso Transfers were made.

351.     Pursuant to section 547(g) of the Bankruptcy Code, Amistoso bears the burden of proof of any defenses she may possess under section 547(c) of the Bankruptcy Code.

352.     Accordingly, the Trustee is entitled to an order and judgment against Amistoso avoiding each Amistoso Transfer pursuant to section 547(b) of the Bankruptcy Code.

**WHEREFORE**, the Trustee requests that the Court enter an order and judgment against Amistoso avoiding each Amistoso Transfer pursuant to section 547(b) of the Bankruptcy Code, awarding interest thereon to the date of payment and the costs of this action to the Trustee, and for such other and further relief as the Trustee is entitled or the Court deems just.

## COUNT XII

### (Recovery of Avoided Preferential Transfers Under 11 U.S.C. § 550)

*(Against Collins)*

353.     The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

354.    The Trustee is entitled to avoid the Collins Transfers described in this Complaint pursuant to section 547(b) of the Bankruptcy Code.

355.    Collins was the initial transferee of the Collins Transfers or the immediate or mediate transferee of such initial transferee or the person or entity for whose benefit the Collins Transfers were made.

356.    Pursuant to section 550(a) of the Bankruptcy Code, the Trustee is entitled to recover the Collins Transfers from Collins, plus interest thereon to the date of payment and the costs of this action.

**WHEREFORE**, the Trustee requests that the Court enter an order allowing the Trustee to recover from Collins all Collins Transfers pursuant to section 550 of the Bankruptcy Code, awarding interest thereon to the date of payment and the costs of this action to the Trustee, and for such other and further relief as the Trustee is entitled or the Court deems just.

## COUNT XIII

### (Recovery of Avoided Preferential Transfers Under 11 U.S.C. § 550)

*(Against Gustafson)*

357.    The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

358.    The Trustee is entitled to avoid the Gustafson Transfers described in this Complaint pursuant to section 547(b) of the Bankruptcy Code.

359.    Gustafson was the initial transferee of the Gustafson Transfers or the immediate or mediate transferee of such initial transferee or the person or entity for whose benefit the Gustafson Transfers were made.

360.    Pursuant to section 550(a) of the Bankruptcy Code, the Trustee is entitled to recover the Gustafson Transfers from Gustafson, plus interest thereon to the date of payment and the costs of this action.

**WHEREFORE**, the Trustee requests that the Court enter an order allowing the Trustee to recover from Gustafson all Gustafson Transfers pursuant to section 550 of the Bankruptcy Code, awarding interest thereon to the date of payment and the costs of this action to the Trustee, and for such other and further relief as the Trustee is entitled or the Court deems just.

## COUNT XIV

### (Recovery of Avoided Preferential Transfers Under 11 U.S.C. § 550)

*(Against Amistoso)*

361. The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

362. The Trustee is entitled to avoid the Amistoso Transfers described in this Complaint pursuant to section 547(b) of the Bankruptcy Code.

363. Amistoso was the initial transferee of the Amistoso Transfers or the immediate or mediate transferee of such initial transferee or the person or entity for whose benefit the Amistoso Transfers were made.

364. Pursuant to section 550(a) of the Bankruptcy Code, the Trustee is entitled to recover the Amistoso Transfers from Amistoso, plus interest thereon to the date of payment and the costs of this action.

**WHEREFORE**, the Trustee requests that the Court enter an order allowing the Trustee to recover from Amistoso all Amistoso Transfers pursuant to section 550 of the Bankruptcy Code, awarding interest thereon to the date of payment and the costs of this action to the Trustee, and for such other and further relief as the Trustee is entitled or the Court deems just.

## COUNT XV

### (Disallowance of Claims – 11 U.S.C. § 502(d))

*(Against Collins)*

365. The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

366.     Collins is a transferee of the Collins Transfers avoidable pursuant to section 547 of the Bankruptcy Code, which are recoverable under section 550 of the Bankruptcy Code.

367.     Collins has not paid the amount of the Collins Transfers or turned over such property for which Collins is liable under section 550 of the Bankruptcy Code.

368.     Pursuant to section 502(d) of the Bankruptcy Code, any and all claims of Collins against the Debtor (to the extent any such claim exists and was preserved by timely filing a proof of claim in the Chapter 7 Case) must be disallowed until such time as Collins pays the Trustee the amount equal to the aggregate amount of all of the Collins Transfers, plus interest thereon and costs.

**WHEREFORE**, the Trustee requests that the Court enter an order disallowing any and all claims that Collins has asserted (to the extent any such claim exists and was preserved by timely filing a proof of claim in the Chapter 7 Case) until such time as Collins pays the Trustee the amount equal to all of the Collins Transfers and interest thereon to the date of payment and the costs of this action to the Trustee, and for such other and further relief as the Trustee is entitled or the Court deems just.

## COUNT XVI

### (Disallowance of Claims – 11 U.S.C. § 502(d))

*(Against Gustafson)*

369.     The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

370.     Gustafson is a transferee of the Gustafson Transfers avoidable pursuant to section 547 of the Bankruptcy Code, which are recoverable under section 550 of the Bankruptcy Code.

371.     Gustafson has not paid the amount of the Gustafson Transfers or turned over such property for which Gustafson is liable under section 550 of the Bankruptcy Code.

372.     Pursuant to section 502(d) of the Bankruptcy Code, any and all claims of Gustafson against the Debtor (to the extent any such claim exists and was preserved by timely filing a proof of claim in the Chapter 7 Case) must be disallowed until such time as Gustafson pays the Trustee the amount equal to the aggregate amount of all of the Gustafson Transfers, plus interest thereon and costs.

**WHEREFORE**, the Trustee requests that the Court enter an order disallowing any and all claims that Gustafson has asserted (to the extent any such claim exists and was preserved by timely filing a proof of claim in the Chapter 7 Case) until such time as Gustafson pays the Trustee the amount equal to all of the Gustafson Transfers and interest thereon to the date of payment and the costs of this action to the Trustee, and for such other and further relief as the Trustee is entitled or the Court deems just.

## COUNT XVII

## (Disallowance of Claims – 11 U.S.C. § 502(d))

*(Against Amistoso)*

373.     The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

374.     Amistoso is a transferee of the Amistoso Transfers avoidable pursuant to section 547 of the Bankruptcy Code, which are recoverable under section 550 of the Bankruptcy Code.

375.     Amistoso has not paid the amount of the Amistoso Transfers or turned over such property for which Amistoso is liable under section 550 of the Bankruptcy Code.

376.     Pursuant to section 502(d) of the Bankruptcy Code, any and all claims of Amistoso against the Debtor (to the extent any such claim exists and was preserved by timely filing a proof of claim in the Chapter 7 Case) must be disallowed until such time as Amistoso pays the Trustee the amount equal to the aggregate amount of all of the Amistoso Transfers, plus interest thereon and costs.

**WHEREFORE**, the Trustee requests that the Court enter an order disallowing any and all claims that Amistoso has asserted (to the extent any such claim exists and was preserved by timely filing a proof of claim in the Chapter 7 Case) until such time as Amistoso pays the Trustee the amount equal to all of the Amistoso Transfers and interest thereon to the date of payment and the costs of this action to the Trustee, and for such other and further relief as the Trustee is entitled or the Court deems just.

## COUNT XVIII

### (Avoidance of Fraudulent Transfers Under 11 U.S.C. § 548(a)(1))

*(Against Collins)*

377.    Section 548 of the Bankruptcy Code provides, in pertinent part, as follows:

(a)(1)  The Trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily –

(A)      made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(B)(i)  received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(B)(ii)(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

(B)(ii)(III) intended to incur, or believed that debtor would incur; debts that would be beyond the debtor's ability to pay as such debts matured; or

(B)(ii)(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1).

378.     The Collins Transfers were made with actual intent to hinder, delay, or defraud any entity to which the Debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

379.     Alternatively, the Debtor received less than a reasonably equivalent value in exchange for the Collins Transfers, and the Debtor was either (i) insolvent on the date the transfer of the Collins Transfers occurred or (ii) became insolvent as a result of such transfers.

380.     One or more of the Collins Transfers was made to the benefit of Collans, an insider, under an employment contract and not in the ordinary course of business.

381.     Accordingly, the transfer of the Collins Transfers was fraudulent, and the Trustee is entitled to avoid the Collins Transfers pursuant to section 548 of the Bankruptcy Code.

**WHEREFORE**, the Trustee requests that the Court enter an order and judgment against Collins avoiding each Collins Transfer pursuant to section 548 of the Bankruptcy Code, awarding interest thereon to the date of payment and the costs of this action to the Trustee, and for such other and further relief as the Trustee is entitled or the Court deems just (including an award of attorneys' fees to the extent of actual fraud).

**COUNT XIX**

**(Avoidance of Fraudulent Transfers Under 11 U.S.C. § 548(a)(1))**

(*Against Gustafson*)

382.     Section 548 of the Bankruptcy Code provides, in pertinent part, as follows:

(a)(1)   The Trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily –

(A)     made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(B)(i)   received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(B)(ii)(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

(B)(ii)(III) intended to incur, or believed that debtor would incur; debts that would be beyond the debtor's ability to pay as such debts matured; or

(B)(ii)(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1).

383.    The Gustafson Transfers were made with actual intent to hinder, delay, or defraud any entity to which the Debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

384.    Alternatively, the Debtor received less than a reasonably equivalent value in exchange for the Gustafson Transfers, and the Debtor was either (i) insolvent on the date the transfer of the Gustafson Transfers occurred or (ii) became insolvent as a result of such transfers.

385.    One or more of the Gustafson Transfers was made to the benefit of Gustafson, an insider, under an employment contract and not in the ordinary course of business.

386.    Accordingly, the transfer of the Gustafson Transfers was fraudulent, and the Trustee is entitled to avoid the Gustafson Transfers pursuant to section 548 of the Bankruptcy Code.

**WHEREFORE**, the Trustee requests that the Court enter an order and judgment against Gustafson avoiding each Gustafson Transfer pursuant to section 548 of the Bankruptcy Code, awarding interest thereon to the date of payment and the costs of this action to the Trustee, and for such other and further relief as the Trustee is entitled or the Court deems just (including an award of attorneys' fees to the extent of actual fraud).

## COUNT XX

### (Avoidance of Fraudulent Transfers Under 11 U.S.C. § 548(a)(1))

*(Against Amistoso)*

387.    Section 548 of the Bankruptcy Code provides, in pertinent part, as follows:

(a)(1)  The Trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily –

(A)      made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(B)(i)  received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(B)(ii)(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

(B)(ii)(III) intended to incur, or believed that debtor would incur; debts that would be beyond the debtor's ability to pay as such debts matured; or

(B)(ii)(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1).

388.    The Amistoso Transfers were made with actual intent to hinder, delay, or defraud any entity to which the Debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

389.    Alternatively, the Debtor received less than a reasonably equivalent value in exchange for the Amistoso Transfers, and the Debtor was either (i) insolvent on the date the transfer of the Amistoso Transfers occurred or (ii) became insolvent as a result of such transfers.

390.    One or more of the Amistoso Transfers was made to the benefit of Amistoso, an insider, under an employment contract and not in the ordinary course of business.

391.    Accordingly, the transfer of the Amistoso Transfers was fraudulent, and the Trustee is entitled to avoid the Amistoso Transfers pursuant to section 548 of the Bankruptcy Code.

**WHEREFORE**, the Trustee requests that the Court enter an order and judgment against Gustafson avoiding each Amistoso Transfer pursuant to section 548 of the Bankruptcy Code, awarding interest thereon to the date of payment and the costs of this action to the Trustee, and for such other and further relief as the Trustee is entitled or the Court deems just (including an award of attorneys' fees to the extent of actual fraud).

## COUNT XXI

**(Avoidance of Fraudulent Transfers Under 11 U.S.C. § 544 and 6 Del. C. § 1304)**

*(Against Collins, Gustafson, and Amistoso)*

392.    Plaintiff repeats and re-alleges the allegations contained in prior paragraphs, which are incorporated by reference as if set forth fully herein.

393.    Section 544 of the Bankruptcy Code provides as follows:

(a)    The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—

>    (1)    a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;
>
>    (2)    a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists; or
>
>    (3)    a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.
>
> (b)(1)   Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.
>
> (b)(2)   Paragraph (1) shall not apply to a transfer of a charitable contribution (as that term is defined in section 548(d)(3)) that is not covered under section 548(a)(1)(B), by reason of section 548(a)(2).  Any claim by any person to recover a transferred contribution described in the preceding sentence under Federal or State law in a Federal or State court shall be preempted by the commencement of the case.

11 U.S.C. § 544.

394.    Delaware Code Title 6, § 1304, titled "Transfers fraudulent as to present and future creditors," provides, in pertinent part, as follows:

>    (a)    A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
>       (1)    With actual intent to hinder, delay or defraud any creditor of the debtor; or
>
>       (2)    Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

      a.     Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

      b.     Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

6 Del. C. § 1304.

395.    The Collins Transfers, the Gustafson Transfers, and/or the Amistoso Transfers were made with actual intent to hinder, delay, or defraud any creditor of the Debtor.

396.    Alternatively, the Debtor did not receive a reasonably equivalent value in exchange for the Collins Transfers, the Gustafson Transfers, and/or the Amistoso Transfers, and at the time of the such transfers, the Debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction.

**WHEREFORE**, the Trustee requests that the Court enter an order and judgment against Collins, Gustafson, and Amistoso avoiding each of the Collins Transfers, the Gustafson Transfers, and/or the Amistoso Transfers pursuant to section 544 of the Bankruptcy Code and 6 Del. C. § 1304, awarding interest thereon to the date of payment and the costs of this action to the Trustee, and for such other and further relief as the Trustee is entitled or the Court deems just (including an award of attorneys' fees to the extent the Trustee is so entitled).

## COUNT XXII

### (Avoidance of Fraudulent Transfers Under 11 U.S.C. § 544 and 6 Del. C. § 1305)

*(Against Collins, Gustafson, and Amistoso)*

397.    The Trustee repeats and realleges each of the allegations set forth in the paragraphs above as if fully set forth herein.

398.    Delaware Code Title 6, § 1305, titled "Transfers fraudulent as to present creditors," provides, in pertinent part:

>       (a)    A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.
>
>       (b)    A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time and the insider had reasonable cause to believe that the debtor was insolvent.

399.  6 Del. C. § 1305.

400.    The Debtor made the  Collins Transfers, the Gustafson Transfers, and/or the Amistoso Transfers without receiving a reasonably equivalent value in exchange for such transfers.

401.    The Debtor was insolvent at the times that the Collins Transfers, the Gustafson Transfers, and/or the Amistoso Transfers were made.

**WHEREFORE**, the Trustee requests that the Court enter an order and judgment against Collins, Gustafson, and Amistoso avoiding each of the Collins Transfers, the Gustafson Transfers, and/or the Amistoso Transfers pursuant to section 544 of the Bankruptcy Code and 6 Del. C. § 1304, awarding interest thereon to the date of payment and the costs of this action to the Trustee, and for such other and further relief as the Trustee is entitled or the Court deems just.

## COUNT XXIII

### (Recovery of Avoided Fraudulent Transfers Under 11 U.S.C. § 550)

#### (*Against Collins*)

402.    The Trustee repeats and realleges each of the allegations set forth in the paragraphs above as if fully set forth herein.

403.    Collins is either (i) the initial transferee of the Collins Transfers or the entity for whose benefit the Collins Transfers were made; or (ii) an immediate or mediate transferee of such initial transferee.

404.    To the extent that the transfer of one or more of the Collins Transfers is avoided under section 548 of the Bankruptcy Code, the Trustee may recover, for the benefit of the estate, the property transferred, or if the court so orders, the value of such property pursuant to section 550 of the Bankruptcy Code.

**WHEREFORE**, the Trustee requests that the Court enter an order allowing the Trustee to recover from Collins all Collins Transfers pursuant to section 550 of the Bankruptcy Code, awarding interest thereon to the date of payment and the costs of this action to the Trustee, and for such other and further relief as the Trustee is entitled or the Court deems just.

## COUNT XXIV

### (Recovery of Avoided Fraudulent Transfers Under 11 U.S.C. § 550)

(*Against Gustafson*)

405.    The Trustee repeats and realleges each of the allegations set forth in the paragraphs above as if fully set forth herein.

406.    Gustafson is either (i) the initial transferee of the Gustafson Transfers or the entity for whose benefit the Gustafson Transfers were made; or (ii) an immediate or mediate transferee of such initial transferee.

407.    To the extent that the transfer of one or more of the Gustafson Transfers is avoided under section 548 of the Bankruptcy Code, the Trustee may recover, for the benefit of the estate, the property transferred, or if the court so orders, the value of such property pursuant to section 550 of the Bankruptcy Code.

**WHEREFORE**, the Trustee requests that the Court enter an order allowing the Trustee to recover from Gustafson all Gustafson Transfers pursuant to section 550 of the Bankruptcy Code, awarding interest thereon to the date of payment and the costs of this action to the Trustee, and for such other and further relief as the Trustee is entitled or the Court deems just.

## COUNT XXV

### (Recovery of Avoided Fraudulent Transfers Under 11 U.S.C. § 550)

*(Against Amistoso)*

408.    The Trustee repeats and realleges each of the allegations set forth in the paragraphs above as if fully set forth herein.

409.    Amistoso is either (i) the initial transferee of the Amistoso Transfers or the entity for whose benefit the Amistoso Transfers were made; or (ii) an immediate or mediate transferee of such initial transferee.

410.    To the extent that the transfer of one or more of the Amistoso Transfers is avoided under section 548 of the Bankruptcy Code, the Trustee may recover, for the benefit of the estate, the property transferred, or if the court so orders, the value of such property pursuant to section 550 of the Bankruptcy Code.

**WHEREFORE**, the Trustee requests that the Court enter an order allowing the Trustee to recover from Amistoso all Amistoso Transfers pursuant to section 550 of the Bankruptcy Code, awarding interest thereon to the date of payment and the costs of this action to the Trustee, and for such other and further relief as the Trustee is entitled or the Court deems just.

## COUNT XXVI

**(Recovery of Avoided Fraudulent Transfers Under 11 U.S.C. § 544 and 6 Del C. § 1307)**

(*Against Collins*)

411. The Trustee repeats and realleges each of the allegations set forth in the paragraphs above as if fully set forth herein.

412. Title 6 of the Delaware Code, § 1307, titled "Remedies of creditors," provides:

> (a)    In an action for relief against a transfer or obligation under this chapter, a creditor, subject to the limitations in § 1308 of this title, may obtain:

> > (1)    Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim . . . .

6 Del. C. § 1307.

413. To the extent that the transfer of the Collins Transfers is avoided under 6 Del. C. § 1304, *et seq.*, the Trustee may recover, for the benefit of the estate, the property transferred or the value of such property pursuant to 6 Del. C. § 1304, *et seq.*

414. The transfer of the Collins Transfers should be avoided.

**WHEREFORE**, the Trustee requests that the Court enter an order allowing the Trustee to recover from Collins all Collins Transfers pursuant to section 544 of the Bankruptcy Code and 6 Del C. § 1307, awarding interest thereon to the date of payment and the costs of this action to the Trustee, and for such other and further relief as the Trustee is entitled or the Court deems just.

## COUNT XXVII

**(Recovery of Avoided Fraudulent Transfers Under 11 U.S.C. § 544 and 6 Del C. § 1307)**

(*Against Gustafson*)

415. The Trustee repeats and realleges each of the allegations set forth in the paragraphs above as if fully set forth herein.

416. Title 6 of the Delaware Code, § 1307, titled "Remedies of creditors," provides:

> (a)      In an action for relief against a transfer or obligation under this chapter, a creditor, subject to the limitations in § 1308 of this title, may obtain:
>
>> (1)      Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim . . . .

6 Del. C. § 1307.

417.    To the extent that the transfer of the Gustafson Transfers is avoided under 6 Del. C. § 1304, *et seq.*, the Trustee may recover, for the benefit of the estate, the property transferred or the value of such property pursuant to 6 Del. C. § 1304, *et seq.*

418.    The transfer of the Gustafson Transfers should be avoided.

**WHEREFORE**, the Trustee requests that the Court enter an order allowing the Trustee to recover from Gustafson all Gustafson Transfers pursuant to section 544 of the Bankruptcy Code and 6 Del C. § 1307, awarding interest thereon to the date of payment and the costs of this action to the Trustee, and for such other and further relief as the Trustee is entitled or the Court deems just.

## <u>COUNT XXVIII</u>

### (Recovery of Avoided Fraudulent Transfers Under 11 U.S.C. § 544 and 6 Del C. § 1307)

*(Against Amistoso)*

419.    The Trustee repeats and realleges each of the allegations set forth in the paragraphs above as if fully set forth herein.

420.    Title 6 of the Delaware Code, § 1307, titled "Remedies of creditors," provides:

> (a)      In an action for relief against a transfer or obligation under this chapter, a creditor, subject to the limitations in § 1308 of this title, may obtain:
>
>> (1)      Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim . . . .

6 Del. C. § 1307.

421.    To the extent that the transfer of the Amistoso Transfers is avoided under 6 Del. C. § 1304, *et seq.*, the Trustee may recover, for the benefit of the estate, the property transferred or the value of such property pursuant to 6 Del. C. § 1304, *et seq.*

422.    The transfer of the Amistoso Transfers should be avoided.

**WHEREFORE**, the Trustee requests that the Court enter an order allowing the Trustee to recover from Amistoso all Amistoso Transfers pursuant to section 544 of the Bankruptcy Code and 6 Del C. § 1307, awarding interest thereon to the date of payment and the costs of this action to the Trustee, and for such other and further relief as the Trustee is entitled or the Court deems just.

## COUNT XXIX

**(Recovery of Payments Made From Sources Other than the Debtor)**

(*Against All Defendants*)

423.    The Trustee repeats and realleges each of the allegations set forth in the paragraphs above as if fully set forth herein.

424.    On information and belief, certain entities which are related to the Debtor (collectively, the "*Debtor Affiliates*"), such as, without limitation, NWC Worth Collection Holdings, LLC, Worth Investment Holdings, LLC, and Worth Collection Intermediate Holdings, LLC, were inextricably intertwined with the Debtor, with the goal of shielding assets from creditors and insulating liability.

425.    Substantive consolidation, a construct of federal common law, emanates from equity. It "treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities (save for inter-entity liabilities, which are erased). The result is that claims of creditors against separate debtors morph to claims against the consolidated

survivor." *Genesis Health Ventures, Inc. v. Stapleton* (*In re Genesis Health Ventures, Inc.*), 402 F.3d 416, 423 (3d Cir. 2005).

426.     As described by Judge Walsh in a published opinion in this district (citing his prior unpublished decision in the same case), he approved non-debtor substantive consolidation *nunc pro tunc* to the debtor's petition date of a debtor where a debtor "'ran its business and entities as a unified enterprise under common ownership and control' with a 'small group of insiders [that] employed that control to raise cash, commingle it, and then distribute it as needs presented." *In re DBSI, Inc.*, 445 B.R. 344, 346 to 347 (Bankr. D. Del. 2011).

427.     To the extent any of the Defendants received transfers from any of the Debtor Affiliates, including transfers not yet identified by the Trustee (the "*Affiliate Transfers*"), the Trustee hereby seeks to: (a) substantively consolidate such entity or entities with the Debtor *nunc pro tunc* to the Petition Date; and (b) avoid and recover any such additional transfers in accordance with each other cause of action contained in this Complaint.

**WHEREFORE**, the Trustee requests that the Court enter an order allowing the Trustee to recover from the Defendants all Affiliate Transfers received by or on behalf of the Defendants pursuant to sections 105(a) and 550 of the Bankruptcy Code, awarding interest thereon to the date of payment and the costs of this action to the Trustee, and for such other and further relief as the Trustee is entitled or the Court deems just.

*[Signatures on following page]*

Dated: February 18, 2024
Wilmington, Delaware

Respectfully submitted,

**GOLDSTEIN & MCCLINTOCK LLLP**

By:  */s/ Maria Aprile Sawczuk*
Maria Aprile Sawczuk, Esq. (Bar ID 3320)
501 Silverside Road, Suite 65
Wilmington, DE 19809
Telephone: (302) 444-6710
marias@goldmclaw.com

*-and-*

Harley J. Goldstein, Esq. (admitted *pro hac vice*)
Ainsley G. Moloney, Esq. (admitted *pro hac vice*)
Neha P. Khandhadia, Esq. (admitted *pro hac vice*)
111 W. Washington Street, Suite 1221
Chicago, IL 60602
Telephone: (312) 337-7700
harleyg@goldmclaw.com
ainsleyg@goldmclaw.com
nehak@goldmclaw.com

*Counsel for the Chapter 7 Trustee*